[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12187

_____

D. C. Docket No. 05-00770-CV-ORL-19-JA-DA
BKCY No. 03-00299-BKC-KS

In Re:


ADVANCED TELECOMMUNICATION NETWORK, INC.

Debtor.

_____

ADVANCED TELECOMMUNICATION NETWORK, INC.,

Plaintiff-Appellant,

versus

DANIEL W. ALLEN,
DAVID D. ALLEN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 9, 2007)**

Before BARKETT and KRAVITCH, Circuit Judges, and TRAGER,[*] District Judge.

BARKETT, Circuit Judge:

Advanced Telecommunications Network, Inc. ("ATN"), a chapter 11 bankrupt debtor seeking to recover certain transfers made before the company declared bankruptcy, appeals from a district court order affirming a bankruptcy court judgment in favor of Daniel Allen ("Allen") and his brother David, the recipients of the disputed transfers. ATN focuses its claim on a $6 million transfer ATN made to the Allens on June 1, 1999, alleging that the transfer was fraudulent under New Jersey law.

## BACKGROUND

Daniel Allen and Gary Carpenter founded ATN in 1989 as a long-distance reseller of telecommunication services. The company purchased long distance telephone service in bulk from larger carriers, such as AT&T, and resold it to customers. Allen and Carpenter each held exactly half of ATN's voting stock.[1]

By 1996, disputes between Allen and Carpenter had developed into a bitter battle for control of the company. In April 1996, Carpenter (who was then

---

[*] Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

[1] Allen's brother David held 10% of ATN's stock, all of it non-voting. Carpenter's father, Robert, held 20%, all of it non-voting. Daniel Allen and Carpenter each held 35% of the company's stock, all of it voting shares.

2

president of ATN) sent Allen a letter placing him on administrative leave. Although Allen continued to draw salary until August of that year, Carpenter refused to give him access to the company's financial information. On August 14, 1996, Carpenter wrote Allen another letter informing him that his employment with ATN was terminated and that his salary would end at the close of business that day.[2]

**The Allen-Carpenter Litigation**

As a result of Carpenter's actions, Allen sued Carpenter and ATN in New Jersey state court in April 1996, seeking control of the company. Allen argued in that "ATN has been in a serious state of decline" under Carpenter's management, and that "losses exceeded $2 million by November of 1997." With the company frozen while its equal voting directors—Allen and Carpenter—fought for control, the court appointed a third director (Rutgers Law School Dean Milton Leontiades) to help the company remain afloat. The company was able to avoid bankruptcy, and the case proceeded to trial in December 1998. ATN actively participated at trial, and retained separate, independent counsel.

On December 23, 1998, in the midst of the evidentiary presentation for trial,

---

[2] Allen nevertheless remained a corporate secretary, director, and shareholder of ATN until 1999. His only access to financial information about the company during that time, however, came through documents produced during litigation.

3

attorneys for the Allens and Carpenter met and signed a short, handwritten settlement agreement which relieved Carpenter of any personal liability to the Allens. No lawyer for ATN was present or participated in this meeting. Nonetheless, the terms of the agreement provided that ATN would pay the Allens' attorneys $1.25 million in fees by January 15, plus another $100,000 by January 31, 1999. ATN would then transfer an additional $6 million to the Allens themselves no later than June 1, 1999. ATN was also required to forgive the Allens' debts to the company, which totaled approximately $1.6 million, and advance any funds needed by the Allens to pay for tax liabilities arising from their ownership of ATN. The handwritten agreement was signed by the lawyers for the Allens and Carpenter. No one signed the handwritten document on behalf of ATN.

The handwritten agreement was subsequently formalized in a 23-page typed document on January 12, 1999 ("Agreement"). This time, Carpenter signed on behalf of ATN in his capacity as president, as did Daniel Allen in his capacity as secretary. Carpenter and Allen also signed a separate Consent Action on behalf of ATN's shareholders, approving the actions required under the Agreement. The two men also signed in their individual capacities. The Agreement provided additional detail as to terms, but did not differ in substance from the handwritten document signed by Carpenter and Allen weeks earlier.

4

**The Disputed Transfer**

Carpenter, Allen, and ATN all fulfilled their obligations under the Agreement. Just after the Agreement was signed, ATN paid $1,250,000 to Allens' attorneys and, as agreed, paid them an additional $100,000 in three later installments. Also pursuant to the terms of the Agreement, ATN paid the Allens $250,000 on January 12, 1999, and an additional $6 million on June 1, 1999. This money went directly to the Allens from ATN's coffers. It never passed through any individual account owned by Carpenter, even though the money was used to settle a lawsuit filed by Allen against Carpenter individually.

Sometime <u>after</u> June 1, these $6.25 million payments from ATN to Allen were recharacterized as <u>loans</u> to Carpenter, who signed two promissory notes—one back-dated to January 17, 1999, and one back-dated to June 1, 1999—in the amounts of $250,000 and $6,000,000, respectively. The notes retroactively recharacterized the transfers as <u>purchases</u> by Carpenter's <u>purchase</u> of the Allens' stock from ATN,, in exchange for Carpenter's promise to pay ATN $6,250,000 and assume the Allens' $1.6 million in shareholder loans.

**The ATN-WATS Dispute**

Beginning in 1995, ATN was also engaged in a contract dispute with

WATS/800, Inc. ("WATS"[3]), a competitor. WATS[4] filed a $39 million claim against ATN, which was still pending when ATN made the $6 million transfer to the Allens.

ATN and WATS settled their dispute on October 19, 2000, about a year and a half after Allen and Carpenter settled their dispute. The parties agreed that ATN would pay $10.5 million to WATS to settle the claims.[5] As part of the settlement, Carpenter relinquished control of ATN to two companies controlled by WATS president Damian Freeman, thus placing Freeman in control of ATN, where he remains.

**The Current Litigation**

Following the June 1999 transfer of $6 million to the Allens,[6] and the

---

[3] WATS/800, Inc. filed for bankruptcy during the pendency of its litigation against ATN. One of Freeman's other companies, WATS/800 Holding, Inc., purchased WATS/800, Inc.'s interest in the litigation against ATN for $10,000, and pursued the claim itself. Freeman remained in control throughout this period.

[4] For simplicity's sake, we refer to WATS as the plaintiff against ATN, but in reality there were two: WATS and Investment Partners LLP ("IP"), which alleged that WATS/800, Inc. (which became defunct during the WATS-ATN litigation) had improperly transferred IP's collateral to ATN. IP initially alleged a secured claim of approximately $3 million, and was eventually found to be entitled to $4.5 million of the $10.5 million final settlement.

[5] Carpenter, acting on behalf of ATN, subsequently executed a promissory note payable to WATS for $5.5 million. The $500,000 balance (the difference between $6 million and $5.5 million) was accounted for by ATN's assignment to WATS and IP the claims ATN held against the Allens in the current litigation. As the bankruptcy court explained, "[i]n effect, WATS gave ATN credit for the value of the fraudulent transfers claims asserted against the Allens in this litigation."

[6] The funds for the transfer were apparently taken from prepaid customer accounts.

October 2000 settlement between ATN and WATS (and accompanying management shuffle, as Freeman replaced Carpenter at the helm of ATN), ATN continued to operate as a going enterprise for nearly three years before filing for reorganization under Chapter 11. On January 12, 2003, ATN filed the petition initiating the present case, seeking to recover the money transferred to the Allens in 1999. ATN asserted 13 counts in its Amended Complaint: six fraudulent transfer claims and one count of improper distribution to shareholders, plus counts alleging actual fraud, conflict of interest, unjust enrichment, right to an accounting, equitable subordination, and turnover.

The bankruptcy court rejected ATN's fraudulent transfer claims, finding them to be barred by New Jersey's four-year statute of limitations period because the "obligation" giving rise to the transfer arose on December 28, 1998, when the handwritten agreement between Allen and Carpenter was signed—four years and two weeks prior to the filing of the lawsuit. Alternatively, the court found that ATN's claims failed as a matter of law because ATN had failed to satisfy the two elements of fraudulent transfer under New Jersey law: (1) that ATN was insolvent at the time of the $6 million transfer, and (2) that ATN received less than reasonably equivalent value in return for the transfer. See N.J. Stat. Ann. § 25:2-27.a. ATN appealed the bankrtupcy court's decisions on Counts 1, 2, 5, 6, and

7

7—alleging constructive fraud (Counts 1, 2, 5, and 6) and improper shareholder distributions (Count 7)—to the district court,[7] which affirmed the bankruptcy court in a brief opinion. ATN then timely appealed to this Court.

## DISCUSSION

As an initial matter, we must determine whether ATN's fraudulent transfer claims are barred by the applicable statute of limitations. Because we find that the statute of limitations does <u>not</u> bar the claim, we then turn to the bankruptcy court's alternative holding, which rejected the <u>merits</u> of ATN's fraudulent transfer claim.

Under New Jersey law, a corporation's transfer of cash to its shareholders is fraudulent if (1) the transferor (ATN) made the transfer while insolvent, and (2) the transferor received less than "a reasonably equivalent value" in exchange. <u>N.J. Stat. Ann</u>. § 25:2-27.a. The bankruptcy court ruled against ATN on both prongs of this test. After careful review, we find that the bankruptcy court erred both by finding that ATN was solvent at the time of the transfer and by finding that it received "reasonably equivalent value" for the $6 million transfer.

## I. The Statute of Limitations Does Not Bar ATN's Claims

Under New Jersey law, fraudulent transfer claims must be filed within four years of the date "the transfer was made or the obligation was incurred." <u>N.J. Stat.</u>

---

[7] The remaining counts are abandoned, and we do not consider them here.

Ann. § 25:2-31. The claims in this case were filed on January 10, 2003. The parties dispute, however, whether the statutory period ended before or after that date.[8]

We find that the ATN's "obligation" was not incurred until Carpenter and Allen signed the Agreement on the company's behalf on January 12, 1999. According to New Jersey law, "an obligation is incurred . . . [i]f evidenced by a writing, when the writing executed by the obligor is delivered to or for the benefit of the obligee." N.J. Stat. Ann. § 25:2-28.e.2. ATN did not participate in the drafting of the December 23, 1998 handwritten agreement, and did not sign it. None of the signatories signed the handwritten document on ATN's behalf. ATN thus "incurred" no "obligation" under the handwritten agreement, and we cannot measure the statute of limitations from that date.

Moreover, even if ATN's obligation arose on December 23, 1998, its claims still would not be barred by the statute of limitations. As the bankruptcy court recognized, an "odd quirk" of New Jersey law "allows a party to allege constructive fraud to avoid both a 'transfer' and an 'obligation.' Because of this duality, ATN has alleged two counts for each type of fraudulent transfer claim. One count asserts that the 'transfer' is avoidable. The second count asserts the 'obligation' is avoidable." Bankr. Ct. Order at 2; see N.J. Stat. Ann. § 25:2-27(b).

_____

[8] We review de novo the application of a statute of limitations. Harrison v. Digital Health Plan, 183 F.3d 1235, 1238 (11th Cir. 1999).

9

The bankruptcy court erred, however, by dismissing all of ATN's claims—half of which seek to avoid the transfer—based on the incorrect calculation of the date when ATN's obligation to pay the Allens arose.

**II. ATN Was Insolvent at the Time of the Transfer**

Finding that ATN's petition was timely does not end our inquiry, however. We turn next to the merits, and consider whether ATN has met both prongs of the fraudulent transfer test set out in N.J. Stat. Ann. § 25:2-27.a.[9]

The first prong of the fraudulent transfer inquiry asks whether the debtor making the challenged transfer was "insolvent" at the time the transfer was made. New Jersey law recognizes both presumptive and conclusive insolvency. Under New Jersey law, "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." N.J. Stat. Ann. § 25:2-23.b. A debtor is conclusively insolvent if its debts exceed the fair value of his assets. N.J. Stat. Ann. § 25:2-23.a.

Here, there is no question that the bankruptcy court was right in finding that ATN meets the test of presumptive insolvency. The bankruptcy court found that

---

[9] The bankruptcy court's findings of fact shall not be set aside unless they are clearly erroneous. Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.), 904 F.2d 588, 595 (11th Cir. 1990). However, the application of these facts to the relevant New Jersey law governing insolvency is a question of law which we review de novo. Kaiser Aerospace &Elecs. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.), 244 F.3d 1289, 1295 (11th Cir. 2001).

"[i]n order to accumulate the cash [to pay the Allens and their attorneys], ATN delayed paying some of its regular bills for a short period of time." Bankr. Ct. Order at 12. The company was thus clearly unable to meet its debts as they came due and must be considered presumptively insolvent. Id. at 30 ("As such, under New Jersey law, ATN is presumptively insolvent during this approximately five month time period" between December 23, 1998, and June 1, 1999, when the transfers were made). The parties do not dispute this point, and our independent review of the record confirms the company's dire financial straits. On May 17, 1999, just two weeks before the transfer, ATN Chief Financial Officer Phil Krieger noted in an e-mail to Carpenter: "FYI . . . will need to cut back on payments for next two weeks . . . money for Dan is going to be awfully tight." Three days later, Krieger e-mailed several ATN employees, including Carpenter, saying:

> We will need a substantial portion if not all of the funds that ATN currently has in order to meet the 6/1 payment. We hopefully will have a line of credit in place by that time, but it will not cover the full 6 million. As soon as ATN knows the status of the line and what cash will be available, then I can make a decision on what needs to be done. This of course will be done in conjunction with Gary [Carpenter]. If this thing goes down to the last minute, which we should all expect it will, then that is reality and we will have to deal with it.

By that time, ATN's landlord and insurance carrier were threatening to terminate their agreements with the company, and other vendors were threatening to

11

withhold services. Carpenter himself estimated that on June 1, 1999, the day ATN transferred $6 million to the Allens, the company had only $453 in its checking account. On June 2, the day after the $6 million transfer, ATN actually owed $5 million dollars to AT&T. Although ATN received hundreds of thousands of dollars in the weeks following the transfer, its debts still far exceeded its assets.

The bankruptcy court's finding of presumptive insolvency finding shifted the burden to the Allens to show that ATN was conclusively solvent under a balance sheet test: That is, that the fair value of ATN's assets exceeded the fair value of its debts, notwithstanding the fact that it had not paid its debts as they come due. N.J. Stat. Ann. § 25:2-23.a. Applying this balance sheet test, and apparently relying solely on evidence presented by ATN to prove its insolvency, the bankruptcy court found that ATN was actually solvent at the time of the transfer. The bankruptcy court's reasoning on this point was erroneous.[10]

The bankruptcy court calculated three adjustments to ATN's bottom line,

_____

[10] The parties dispute whether the bankruptcy court's holdings with regard to ATN's solvency at the time of transfer were findings of fact entitled to clear error review or findings of law which we review de novo. Our holding here rests on the bankruptcy court's legal reasoning, and thus our review is de novo. Essentially, we find that the bankruptcy court did not err in calculating the relevant assets and liabilities (a question of fact), it simply failed to make any calculations at all. This is an error of law, not of fact. As explained in more detail below, we find that the bankruptcy court erred by failing to calculate the value of the WATS debt, not that it erred in calculating a value of zero. Similarly, the bankruptcy court failed to discount the value of Carpenter's notes, which were a contingent asset.

12

which began with a net value of <u>negative</u> $216,144.[11] The parties do not dispute the first of these adjustments, by which the court added between $4,655,000 and $7,430,000[12] to the company's assets to reflect the value of its customer list. However, the court's calculation of the second and third adjustments—or, rather, its refusal to do so—requires closer examination. If made, these adjustments would have <u>lowered</u> ATN's net worth by more than $15 million, thus demonstrating clear balance sheet insolvency.

The second adjustment turned on the disputed value of the "shareholder loans" which Carpenter pledged to ATN following ATN's $6.25 million transfer to the Allens. The bankruptcy court upwardly adjusted ATN's assets to reflect the value of these outstanding loans, thus increasing the company's value by $4,520,902. Although the loans were backdated to appear contemporaneous with the transfer, Carpenter's loans arose <u>after</u> the $6.25 million transfer from ATN to the Allens. Because Carpenter had no ability to repay the loans—a fact which was knowable at the time the loans were made—this upward adjustment was erroneous as a matter of law.

---

[11] The court took this figure from a December 31, 1999 report of the auditing company on which all the parties relied, and the Allens do not dispute the figure on appeal.

[12] These were the figures suggested by ATN's expert. The court explicitly and specifically rejected the Allens' expert's proposed adjustment, which would have added $10,827,967 to the company's bottom line.

13

As the bankruptcy court recognized, Carpenter's ability to repay the loans was entirely dependent on ATN's financial performance: "Of course, Carpenter's ability to repay the loans was directly tied to his ability to improve ATN's profitability. If the company succeeded, Carpenter prospered. Conversely, if ATN failed, so did he. Carpenter certainly had no independent income or assets available to repay the substantial shareholders loans." Bankr. Ct. Order at 12 (emphasis added). Effectively, Carpenter pledged the company's dwindling value against itself, knowing that he personally had no funds to make the payments.[13] At the time of the ATN-WATS settlement in October 2000, Carpenter produced an affidavit indicating that he had a negative net worth of $9,471,781, most of it—$8,976,460—due to the promissory notes he gave ATN under the Allen settlement and which he had obviously not been able to repay.[14] In an ironic twist, the bankruptcy court erroneously considered this a reason to discount ATN's argument that the loans were worthless, saying that it "is irreconcilably circular—ATN is insolvent because Carpenter cannot repay his shareholder loans,

---

[13] In making this determination, we rely on the bankruptcy court's account of Carpenter's and ATN's respective financial situations. Thus we need not rely on the testimony of ATN's expert witness, who also determined that Carpenter would be unable to pay back the loans after speaking to him for approximately half an hour.

[14] Freeman, who was then in control of ATN, on October 23, 2000, forgave all of the debt which Carpenter owed to ATN. The company also agreed to pay Carpenter's $25,000 monthly home mortgage payments (it ultimately paid more than $350,000 under the mortgage), and a consulting contract which would pay Carpenter $100,000 annually.

14

and Carpenter cannot repay his shareholder loans because ATN is insolvent." The court was correct about the circularity of the situation, but erred in holding that this circularity favored the Allens. In truth, it simply demonstrated that there was no value underlying Carpenter's promise.

In any case, the shareholder debt was clearly not a liquid asset—the bankruptcy court recognized that "neither Daniel [Allen] nor Carpenter had liquid assets"—and thus had no immediate "value" to ATN. As such, Carpenter's promise to repay money to the company over time (the loans had a ten-year term) should not have been considered—certainly not at full value—as among the company's assets. See In the Matter of Taylor, 228 B.R. 491, 502 (Bankr. M.D. Ga. 1998) ("In calculating the debtor's balance sheet, the court should consider only those assets 'readily susceptible to liquidation and the payment of debts.'" (internal quotation and citation omitted)).

The third adjustment involved ATN's obligation (if any), at the time of the transfer, to WATS in the then-ongoing litigation between those two entities. WATS' suit claimed $39 million in damages, a claim which the parties eventually settled for $10.5 million. ATN argued that the full amount of the settlement should be a downward adjustment to ATN's assets at the time of the transfer because it was a plainly foreseeable liability. The Allens argued, and the bankruptcy court

15

found, that ATN's obligation to WATS did not arise until after the transfer at issue in this case, could not have been reasonably foreseen, and thus no downward adjustment was necessary.[15]  We reject both extreme positions, and find that the proper approach would have simply discounted the expected value of the judgment by the probability of its ever occurring.  Although it may be true, as the bankruptcy court put it, that "no one could have predicted this result with any reasonable certainty," such a precise prediction was not required.  The court was instead required to calculate the present value of the liability—the expected cost of the liability times the estimated chance of it ever occurring.  Unless either the expected cost or the chances of it occurring are equal to zero (that is, the liability is costless, or the chances of it happening are negligible), the estimated value should be more than zero.

New Jersey law requires a bankruptcy court conducting an insolvency analysis to include the value of "claims" against the debtor. Under New Jersey law, a "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

---

[15]  Because of the complicated procedural history of the case, this claim has an odd pedigree. After arguing during his lawsuit with Carpenter that ATN was "in a serious state of decline," that "losses exceeded $2 million by November of 1997," and that Carpenter used the company to his personal benefit, Allen now argues that this transfer—the first he received—was well within the company's means.

disputed, undisputed, legal, equitable, secured, or unsecured." <u>N.J. Stat. Ann</u>. § 25:2-21. By its plain terms, this includes WATS' pending claim against ATN—a prototypical contingent liability.

The "fair value" of a contingent liability, of course, should be discounted according to the possibility of its ever becoming real. Thus in this case the bankruptcy court should have estimated the expected value of a judgment against ATN (ATN's own lawyers had already placed it in the millions well before the case actually settled for $10.5 million), and then multiplied that value by the chance that ATN would face such a judgment (thus, for example, halving the judgment's value if ATN faced only a fifty percent chance of an adverse judgment). The Seventh Circuit Court of Appeals set forth the leading statement of this approach in <u>In re Xonics Photochemical</u>:

> [A] contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real.

841 F.2d 198, 200 (7th Cir. 1998). Thus, "[t]he <u>asset or liability</u> must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." <u>Id.</u> (citations omitted) (emphasis added).

The bankruptcy court should have calculated a discounted value for this liability, especially in light of its willingness to include the value of contingent

17

assets in its balance sheet calculations. The court in fact acknowledged that "both contingent liabilities and contingent assets are appropriately considered," Bankr. Ct. Order at 34 (internal citation omitted), but failed to apply that reasoning to the WATS debt. Had the court done so, it is difficult to imagine that it would have come up with a fair value of zero dollars. While that might be an appropriate valuation for some exceedingly remote or unlikely liabilities, the record evidence shows that, at the time of the transfer, ATN faced a very real prospect of a multi-million dollar obligation to WATS. In January, 1998, almost a year before ATN settled its lawsuit with the Allens, the company had a pending settlement offer from WATS in the amount of $2 million. ATN's counsel advised ATN at that time that the company had significant exposure, and that "[d]iscovery to date indicates that there is a substantial risk that the plaintiff could be successful on all, or part of this claim at the time of trial. Since plaintiff had asserted claims for fraud there is also the possibility, while remote, of punitive damages."

Rather than calculate an appropriately discounted value for this eminently foreseeable liability, however, the bankruptcy court simply said that "certainly no one could have reasonably estimated the amount of the settlement 18 months earlier." Absolute precision, however, is not required. But since ATN's own lawyers had advised it—more than a year prior to the settlement—that the

18

company faced millions of dollars in liability, the bankruptcy court was not justified in simply assigning a dollar value of zero to the liability (the equivalent of saying that there was no chance whatsoever any liability would be incurred). The bankruptcy court implicitly recognized this fact when it noted that "[p]erhaps, upon a thorough review, ATN, in 1999, should have anticipated a contingent liability to ATN in some amount, but exactly $10.5 million seems far fetched." It is of course correct to say that $10.5 million—the amount of the settlement—probably could not have been predicted with any accuracy in 1999. But the court erred by using this uncertainty to completely discount the value of the liability: "Accordingly, the court concludes that no downward adjustment to add a $10.5 million contingent liability payable to WATS is merited." Bankr. Ct. Order at 36 (emphasis added).

Thus the bankruptcy court erred by failing to downwardly adjust ATN's assets according to the (discounted) value of ATN's obligation to WATS. The bankruptcy court effectively gave full positive value to ATN's contingent assets, and no negative value to its contingent debts. As a result, it substantially overvalued the company.[16]

---

[16] On remand, it is possible that the court will again conclude that the company was solvent. It might, for example, discount both the value of the shareholder loans and the WATS litigation by half, and come up with a total downward adjustment of around $7 million, which could be balanced out by the (correct) upward adjustment described above.

19

**III. ATN Received No Reasonably Equivalent Value for the Transfer**

In order to make out a successful fraudulent transfer claim, ATN must show not only that it was insolvent at the time of the challenged action, but also that it failed to receive "a reasonably equivalent value in exchange for the transfer." N.J. Stat. Ann. § 25:2-25. The bankruptcy court here found that ATN failed on this prong as well. This conclusion, too, was error.

By its terms and application, the concept of "reasonably equivalent value" does not demand a precise dollar-for-dollar exchange. In re Perry County Foods, Inc., 313 B.R. 875, 895 (Bankr. N.D. Ala. 2004) (citing Butler Aviation Int'l, Inc. v. Whyte (Matter of Fairchild Aircraft Corp.), 6 F.3d 1119, 1125-26 (5th Cir. 1993)). The benefit received need not be entirely "direct," and courts have occasionally upheld as "reasonably equivalent value" the cessation of shareholder disputes. Schaps v. Just Enough Corporation (In re Pinto Trucking Service, Inc.), 93 B.R. 379, 389-90 (Bankr. E.D. Penn. 1988) (finding reasonable value where company transferred $500,000 to fighting shareholders and forgave shareholder loans totaling $600,000). Nevertheless, courts are to scrutinize the value of transfers much more closely in situations such as this one, which involve transfers to insiders. See General Electric Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc), 185 B.R. 801 (9th Cir. B.A.P. 1995).

20

It is clear from the record that ATN received <u>nothing</u> in return at the actual time of the transfer, other than the (arguable) value of the cessation of Allen and Carpenter's litigation. As the bankruptcy court noted, "[t]he subsequent decision by ATN to characterize the transfers as a loan to Carpenter was an afterthought to balance ATN's financial records." Although the Allens would later argue that Carpenter's shareholder loans were effectively an asset of ATN's, the bankruptcy court noted that "Carpenter's later agreement to repay ATN for the transfers to the Allens does not discount the reality that ATN, not Carpenter, initially made all of the payments." The court emphasized that "although the Allens were not involved in the mechanics of how ATN and Carpenter gather[ed] the money, they, and everyone involved in management at ATN, knew the monies could only come from ATN." We thus cannot count the value of Carpenter's promise towards any value that ATN received, because ATN clearly did not receive the promise "<u>in exchange for</u> the transfer." <u>N.J. Stat. Ann.</u> § 25:2-25 (emphasis added).

Even if we were to consider the value of Carpenter's shareholder loans, however, the value of those loans would have to be deeply discounted to reflect Carpenter's precarious financial situation at the time he made them. As the district court noted, and as explained in more detail above, "Carpenter's ability to repay the loans was directly tied to his ability to improve ATN's profitability. If the

company succeeded, Carpenter prospered. Conversely, if ATN failed, so did he. Carpenter certainly had no independent income or assets available to repay the substantial shareholders loans." Bankr. Ct. Order at 12 (emphasis added). The trial court also found that "ATN's business was one that generated substantial cash in short periods of time," and thus that there was a possibility that Carpenter—whose promise was backed only by the ability of the company to generate substantial value—would be able to pay off some of the loans. This does not change the fact, however, that Carpenter had essentially pledged the value of the company, which the parties agree met the statutory definition of presumptive insolvency, against itself. These promises were built on sand and delivered after the fact. Therefore, they do not present a "reasonably equivalent value" to the $6 million transfer to the Allens.

In addition to Carpenter's promises, the bankruptcy court found that the second major "value" ATN received for its millions of dollars of payment to the Allens was "a quantifiable and more importantly, a final resolution" of the dispute between the Allens and Carpenter.[17] "Continuation of the litigation brought uncertainty, the possibility of an unfavorable judgment against ATN, and a guarantee of substantial attorney fees." At the very least, the value of these

---

[17] In addition to paying the Allens' attorneys' fees, ATN paid all of the attorneys' fees that Carpenter incurred during his dispute with Allen.

attorneys fees should have been discounted based on the probable outcome of the case (as with the value of WATS' claims against ATN). Like Carpenter's shareholder loans, the value of this contingent future liability (contingent on the continuation of the Allen-Carpenter dispute), should have been discounted by the probability of its occurrence. See In re Xonics Photochemical, 841 F.2d at 200. Moreover, it is evident from the record that the true beneficiary of the dispute's resolution was Carpenter, not ATN. In fact, when a copy of the handwritten agreement was provided to ATN's counsel, he immediately recognized it for what it was: "[T]he final agreement will be driven entirely by [Carpenter's] objectives, not those of ATN," and moreover, that the agreement was "far more leveraged than it should be or we anticipated."

Finally, the bankruptcy court found that the $6 million transfer to Allen could not be avoided because it satisfied a pre-existing debt (ATN's promise, under the Agreement) and under New Jersey law the payment of a valid and enforceable debt is generally not subject to avoidance as a fraudulent transfer. See N.J. Stat. Ann. § 25:2-24.a. However, New Jersey law also prohibits companies from making transfers when doing so would make them either presumptively or balance sheet insolvent: "A corporation may not make a distribution if, after giving effect thereto, either: (a) The corporation would be unable to pay its debts as they

23

become due in the usual course of business; or (b) The corporation's total assets would be less than its total liabilities." <u>N.J. Stat. Ann.</u> § 14A:7-14.1(2). As the bankruptcy court properly found, the relevant time for assessing the effect of the distribution was June 1, 1999, not the date the obligation was allegedly incurred (whether that was in December 1998 or January 1999). Since we have already found that the company was insolvent at the time of the transfer, we need not address this question in any length here—ATN's transfer of $6 million to the Allens clearly breached Section 14A:7-14.1(2)'s prohibition as well.

## CONCLUSION

We find that ATN's fraudulent transfer claims were not barred by the statute of limitations. We also reject the bankruptcy court's alternative holding on the merits, because we find that the court erred in its calculation of ATN's solvency and the "value" ATN received in return for the disputed transfer. We therefore **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

24

TRAGER, District Judge, concurring specially:

This case is quite troubling. What ultimately concerns me about this case is that it smacks of maintenance, if not champerty. Freemen, as an insider, held up to 89% of ATN's debt on the bankruptcy filing; he sought to use the WATS/ATN litigation to try to recoup his losses when his own business (WATS) failed. First, he made sure to buy the WATS/ATN lawsuit from the WATS Chapter 7 bankruptcy. Then, he used that litigation to take over ATN and, subsequently, when that endeavor to save his financial fortunes also met no success, he decided to use litigation again as a tool to save himself from his poor business judgment, this time by going after the Allens who had previously sold their interests in ATN to Carpenter. Freemen was in no way defrauded; nor did he suffer any damage as a result of Carpenter's buy-out of the Allens in January 1999. In fact, Freemen knew exactly what he was getting involved in when he agreed to take over ATN approximately eighteen months after Carpenter's buy-out of the Allens. Moreover, he used the WATS/ATN claim not only to gain control of ATN, but also made sure to try to protect himself by receiving a security interest in all of ATN's assets, as well as a $5.5 promissory note from Carpenter, acting on behalf of ATN. Significantly, Freemen received an affidavit from Carpenter declaring his insolvency in exchange for ATN's forgiveness of Carpenter's shareholder loans and

$350,000 in salary and mortgage payments made to Carpenter. Freemen also made certain to purchase ATN's claims against the Allens. That claim, along with Carpenter's affidavit declaring insolvency, provided Freemen with a "get of out jail free" card. After operating ATN for almost three years after the ATN/WATS settlement, and with business still going badly, Freemen cashed that card in and filed the fraudulent transfer action a mere two days before the statute of limitations on that claim would have run. The bottom line is Freemen took a business risk and lost. He should not be allowed to use litigation as a hedge to protect himself from his calculated, and failed, business judgment. Unfortunately, this issue was never directly raised by the Allens.

In any event, I agree with the analysis of the majority until one gets to the valuation of the present value of the contingent liability of the WATS/ATN lawsuit as of June 1, 1999. Although I agree with the test employed, nevertheless, under the facts here, I believe that we have an answer at hand and, therefore, it is unnecessary to remand the issue of valuation of the contingent liability.

In January 1998, more than a year before the June 1999 transfer, WATS was willing to accept about $2 million in settlement for its $39 million claim against ATN.[1] WATS' proffered settlement is the best evidence for what the liability was

---

[1] It is not completely clear whether the $3 million claim Investment Partners LLP ("IP") held against ATN for conversion of their security interest in the customer list was included into

worth between December 28, 1998 and June 1, 1999, as nothing in the record indicates any change during that entire period and, accordingly, that claim is worth $2 million at most.[2] Using WATS' willingness to settle for about $2 million is the most appropriate method of placing a value on this uncertain asset without engaging in speculation by paid and discredited experts.

Additionally corroborating this assessment is that there is no reference to the WATS litigation as a material contingent liability in the notes of ATN's audited financial statements for year ending December 31, 1998. This tends to confirm that the value of the WATS litigation in January 1998 was worth, at the most, about $2 million dollars, and probably substantially less. While ATN's attorney may have expressed concern about ATN's exposure, the fact that WATS was willing to take about $2 million on a $39 million claim is far more compelling evidence of its value. Although this court cannot make findings of fact, the record here would not support a finding that the contingent liability was worth more than about $2 million, and I can see no new evidence coming to light to change that result. Thus, I do not believe it is necessary to remand the issue of valuation of the contingent liability.

the January 1998 $2 million settlement offer.

[2] The district court opinion denying ATN's motion for summary judgment on the fraud claim occurred on September 30, 1999, four months after the June 1999 transfer.

Assuming that the shareholder loans were worth nothing and the WATS claim was worth about $2 million, the issue comes down to what the customer list was worth. The bankruptcy judge did not have to make a definitive finding of the value of the customer list in light of its analysis.[3] However, at this point it will be necessary for the court to do so. Accordingly, I think we should remand the case for the bankruptcy court solely for the purpose of making a definitive valuation of the customer list.[4]

---

[3] While the bankruptcy court found the $10.8 million valuation of the customer list proposed by the Allens' expert to be too high, it noted that all parties agreed that the customer list was equal to or greater than the $5.2 million mid-point proposed by ATN's expert, and could be valued as high as $7.4 million. Thus, assuming the shareholder loans were worth nothing and the contingent liability is valued at about $2 million, the bankruptcy court need only find the customer list to be worth $6.6 million in order for ATN to be in positive territory.

[4] Based on IP's original $3 million security interest in ATN's customer list and its agreement to settle its claims for $4.5 million, it is reasonable to assume that the customer list was worth at least $3 - 4.5 million, if not substantially more.