CARNES, Circuit Judge,
dissenting:
The tax code is nowhere near the center of my intellectual life, and generally I find estate tax law about as exciting as Hegel’s metaphysical theory of the identity of opposites. There is, however, more involved in this case than just the estate tax issue presented, which is how to determine the fair market value of the decedent’s distinctly minority interest in CCC, a closely held corporation whose assets consist primarily of marketable securities with a built-in capital gains tax liability.
*1334 The broader principles implicated by the majority opinion are timeless. They were discussed by Teddy Roosevelt at the close of the century before last:
I wish to preach not the doctrine of ignoble ease but the doctrine of the strenuous life; the life of toil and effort; of labor and strife; to preach that highest form of success which comes not to the man who desires mere easy peace but to the man who does not shrink from danger, from hardship, or from bitter toil, and who out of these wins the splendid ultimate triumph.
Vice President Theodore Roosevelt, The Strenuous Life, Address before the Hamilton Club in Chicago, Illinois (Apr. 10, 1899), in The Penguin Book of Twentieth-Century Speeches 1 (Brian MacArthur ed., 1992). By adopting and extending the arbitrary assumption rule of least effort from Estate of Dunn v. Comm’r, 301 F.3d 339 (5th Cir.2002), the majority gives in to the judicial equivalent of the doctrine of ignoble ease. To avoid the effort, labor, and toil that is required for a more accurate calculation of the estate tax due, the majority simply assumes a result that we all know is wrong. We can do better than that. The Tax Court did.
The corporation whose assets are being valued in this case is a holding company with a portfolio of widely traded securities whose value can be readily determined. Estate of Jelke v. Comm’r, No. 3512-03, 2005 WL 1277407, at *1, 3 (T.C. May 31, 2005). The rate at which the company had liquidated the securities it held in the five years before the decedent’s death is also known to one one-hundredth of a percent. Id. at *2, 8. The parties agreed that the value of the company’s net assets at the time of death is what counts, and they agreed that the market value of the securities CCC held at the time of death should be reduced by some amount for the capital gains tax liability attached to the securities. Id. at *3. That is what the law provides. See 26 C.F.R. § 20.2031-1(b) (“The value of every item of property in-cludible in a decedent’s gross estate ... is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.”); Estate of Blount v. Comm’r, 428 F.3d 1338, 1346 (11th Cir.2005). The disagreement is over how to calculate that reduction in value. Jelke, 2005 WL 1277407, at *3 (“[T]he parties differ as to the amount of the reduction from the value for the potential capital gain tax liability that would arise upon sale of the marketable securities held by the corporation.”).
The estate contends that the full amount of the capital gains tax liability should be deducted from the value of the securities as though they had been sold at the time of death, even though they were not. Id. The IRS wants the capital gains reduction calculated based on projecting the average rate of past liquidation forward and then discounting the taxes that will come due in the future back to present value at the time of death. Id.
The Tax Court summarized the estate’s contention, which was put forward by its expert, Mr. Frazier, as follows:
After discussing several methods, Mr. Frazier used what he described as a combination of the market and asset approaches. Mr. Frazier used the market approach to value CCC’s securities. Purporting to rely on the asset approach to valuation, Mr. Frazier then reduced the total of the market prices for CCC’s securities by the liabilities shown on CCC’s books and the tax liability that would have been incurred if all of CCC’s securities had been sold on decedent’s date of death. Mr. Frazier did not make adjustments to the tax liability for the possibility that sales of CCC’s secu *1335 rities would have occurred after decedent’s date of death. In other words, Mr. Frazier relied on the net asset method to employ an assumption of liquidation as of the valuation date, an event which would trigger recognition of $51,626,884 in capital gain tax. This method produced a $137,008,949 [ ] value for CCC. Mr. Frazier then computed an undiscounted value of $8,823,062 for decedent’s 6.44-percent interest (3,000 of 46,585.51 shares) held in trust.
Id. at *8.
The Tax Court summarized the IRS’s contention, put forward by its expert, Mr. Shaked, as follows:
Respondent’s expert, Mr. Shaked, started with the same market value of CCC’s securities. Mr. Shaked then reduced the assets by liabilities, but he used a different approach from Mr. Frazier’s in arriving at a reduction for the built-in capital gain tax liability. First, he computed CCC’s average securities turnover by reference to the most recent data (1994-98). Using that data, Mr. Shaked computed a 5.95-percent average annual turnover derived from the parties’ stipulated asset turnover rates for 1994-98. Mr. Shaked believed that the 5.95-percent rate was conservative, because the turnover trend was generally decreasing. The use of the 5.95-percent turnover rate results in the capital gain tax’s being incurred over a 16.8-year period (100 percent divided by 5.95 percent).
Mr. Shaked then divided the $51,626,884 tax liability by 16 years to arrive at the average annual capital gain tax liability that would have been incurred each year over this 16-year period — $3,226,680.25 ($51,626,884 divided by 16). Next, he selected a 13.2-percent discount rate based on the average annual rate of return for large-cap stocks in the period from 1926 to 1998, as described in Ibbotson Associates Stocks, Bonds, Bills & Inflation, 1999 Yearbook (Ibbotson 1999). He then computed the present value of the $3,226,680.25 annual tax liability discounted over 16 years using a 13.2-percent interest rate to arrive at a present value for the total capital gain tax liability of $21,082,226. By reducing the $188,635,833 net asset value by the $21,082,226 future tax liability, Mr. Shaked arrived at a $167,553,607 value for CCC. Finally, Mr. Shaked concluded that the undis-counted value for decedent’s 6.44-per-cent interest in CCC was $10,789,164 in contrast to Mr. Frazier’s undiscounted value of $8,823,062. This difference reflects numerically the parties’ differing approaches to the amount of capital gain tax that should be used to reduce the net asset value of CCC.
Id. at *8-9 (footnote omitted).
The Tax Court adopted the IRS’s real value approach, even though it is more complicated than the estate’s simple but arbitrary assumption that all of the assets were sold at the time of death. Id. at *11-12. The court chose the real value approach because it produces a result closer to the actual value of the company’s assets, which in turn leads to a more accurate determination of the sales price a willing buyer and seller would agree on for the shares of the holding company that Jelke owned on the date of his death. Id.
While the real value approach is not perfect and itself makes some assumptions — such as the past rate of liquidation continuing in the future — it produces a more accurate result than the arbitrary assumption method because it more closely reflects the economic interests of those who control the company. The death of one who holds only 6.44 percent of the shares of a holding company, id. at *2, that has been producing an average annual rate *1336 of return of more than 23 percent on securities, id., and that has substantial built-in capital gains taxes, id. at *3, is not going to prompt the liquidation of all of the company’s assets. It would be economically foolish for the majority shareholders to gut the golden goose and bring down on their heads the embedded capital gains tax liability simply because of the death of a minority shareholder, an event of no relevance to their economic interests.
The majority’s approach assumes that the holding company was liquidated on the date of Jelke’s death, and therefore all of its built-in capital gains were incurred (and therefore passed on to its shareholders) immediately. Maj. Op. at 1333. The majority makes that assumption despite the fact that: historically the company has sold only 5.95 percent of its investments and therefore precipitated only that small portion of the total built-in capital gains liability per year, Jelke, 2005 WL 1277407, at *8; the company is earning an annual return of more than 23 percent on its portfolio investments, id. at *2; and, “[a]s of the date of decedent’s death, CCC’s board of directors had no plans to liquidate an appreciable portion of CCC’s portfolio, and they intended to operate CCC as a going concern,” id. Under these circumstances, the notion that the company would suddenly dispose of its highly profitable portfolio, ending the enviable earnings stream, and inflicting a substantial capital gains tax on its shareholders is preposterous. The fact that Jelke died does not make it any less so.
The death of a human being is profoundly important to the person who dies, but it matters not one whit to the laws of economics, which dictate the self-interest of the living. Because the interests of the majority shareholders did not change when Jelke died, the only reasonable expectation is that the holding company will continue to be run as it was before that immaterial event occurred. Yet, the majority insists on pretending that contrary to the economic interests of its shareholders, and contrary to everything that has come before, the company must be assumed to have sold all of its securities on the date of Jelke’s death.
The majority suggests that subtracting the entire $51 million in embedded capital gains liability from the $188.6 million value of the company’s portfolio is the best approach, because “why would a hypothetical willing buyer of CCC shares not adjust his or her purchase price to reflect the entire $51 million amount of CCC’s built-in capital gains tax liability?” Maj. Op. at 1331. The answer, of course, is that the buyer would adjust downward the price he was willing to pay in order to reflect that liability, but the buyer could not reasonably expect the seller to agree to a price that ignored completely the time value of money. No rational seller would accept a price that subtracted the entire amount of the future tax liability as though it were due immediately, when that liability will almost certainly be spread out over future years instead — -the next 16.8 years if existing practices continue. Jelke, 2005 WL 1277407, at *8. Assets with liabilities that will not come due until future years are worth more than those with the same amount of liabilities that are due immediately.
Any rational being would prefer to pay $51 million in taxes spread out over the next 16.8 years, which is how long it would take for the embedded tax liability to come fully due under the company’s historical rate of liquidation, instead of paying the entire $51 million immediately. Ask yourself: If you had the choice would you prefer to pay the taxes you are going to owe over the next 16 or so years in advance, right now, or would you choose to pay those taxes only when they come due *1337 in the future? The majority would assume, because it makes the calculations easier, that you would choose to pay all of your future taxes now.
When tax liabilities and payments are spread out over future years a taxpayer is able to use the unpaid funds to earn more money until the taxes actually do come due. When the amount involved is $51 million and the portion of it that can be invested declines at a rate of only 5.95 percent per year, the interest, dividends, and capital gains that can be earned using that slowly declining balance (and the accumulated earnings that flow from it) are enormous. Ask yourself: Would you put any value on the earnings you could get from investing a declining balance of $51 million, which diminishes at the rate of only 5.95 percent per year, or would you think that all of the money you could earn with the use of that declining principal over the next 16 years would be negligible? The majority’s assumption makes sense only to those who would place no value on the earnings that could be made with the use of $51 million in investment principal as it declines at a rate of 5.95 percent each year for the next 16.8 years.
The majority asserts that a buyer “would not pay the same price for identical blocks of stock, one purchased outright in the marketplace with no tax consequences, and one acquired through the purchase of shares in a closely-held corporation.” Maj. Op. at 1333. Of course not. But we are not talking about the same price. We are talking about a price between two extremes. One extreme is the majority’s approach, which assumes that tax consequences that are likely to come due gradually, over a period of 16.8 future years, have the same effect on price as those that are due immediately. The other extreme, which is the straw man the majority erects, assumes that tax consequences have no effect at all on price. But that is not the position the Tax Court took. Instead, the Tax Court position recognizes that the embedded tax liability will affect price and calculates how much effect it will have, taking into account the size of the tax liability and when it is likely to become due. The Tax Court’s calculation, which is based on the facts, produces a result that is closer to reality than the majority’s assumption of instant liquidation.
To its credit, the majority concedes that its approach is arbitrary. The majority describes its operating premise that a holding company would instantly liquidate its entire investment portfolio on the date of a minority shareholder’s death as an “arbitrary assumption.” Maj. Op. at 1332. Seeking to justify its approach, the majority argues that being arbitrary “provides certainty and finality” and “bypasses the unnecessary expenditure of judicial resources” that is required to make a more realistic calculation. Id. at 1333. Indeed, it does. Of course, the same could be said about any arbitrary assumption, including one that the securities had no value at all or that the capital gains tax liability would never actually be paid for some unknown reason. Either of those arbitrary assumptions would also avoid the unnecessary expenditure of judicial resources while providing certainty and finality. Once the doctrine of ignoble ease and seductive simplicity is allowed to reign, there is no end to the shortcuts that can be taken.
If the majority’s approach is good, the good it provides should not be confined to estate tax law. It should be shared with all areas of the law. To take one example of how the majority’s approach can work its magic, consider the daunting task of calculating the lost future earnings award in the case of one who has been disabled or killed by a tortfeasor. In Culver v. Slater Boat Co., 722 F.2d 114 (Former 5th Cir.1983) (en banc), our predecessor Court *1338 held that: “The calculation of damages suffered either by a person whose personal injuries will result in extended future disability or by the representatives of a deceased person involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value.” Id. at 117. Doing all of that requires a lot of judicial effort as even a cursory reading of the Culver opinion shows.
But no longer is all that bother necessary. The parties need not quarrel over, and courts need not concern themselves with, all the variables that go into calculating a fair award for lost future earnings. After all, the quest for a best estimate of economic reality in such a case is, in the majority’s view: “fluidly etheral,” it involves “hunt-and-peck forecasting,” it is like “flip[ping] a coin,” and it is no better than “gaz[ing] into a crystal ball.” Maj. Op. at 1332.
The alternative to its arbitrary assumption, the majority says, is having courts “prophesying.” Id. So it is, and so it has been throughout the history of our judicial system, because sometimes prophesying is necessary. As is so often the case, the words of Justice Holmes are instructive. In Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), he wrote for the Court, holding that for the purposes of calculating an estate’s charitable deduction for bequeathing the remainder interest in a trust, the value of the trust assets given to the charity had to be discounted by the decedent’s widow’s life estate in the trust. The value of the life estate, in turn, had to be calculated based on the statistically probable (or as our majority would say, “prophesied”) length of the widow’s life. Holmes explained:
[T]he value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true.
Id. at 155, 49 S.Ct. at 292 (citations omitted); accord Rev. Rul. 59-60 § 3.03, 1959-1 C.B. 237 (“Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal.”); see also Culver, 722 F.2d at 123 (“Courts are not prophets and juries are not seers. In making awards to compensate injured plaintiffs or the dependents of deceased workers for loss of future earnings, however, these fact-finders must attempt, in some degree, to gauge future events.”).
From now on, the majority opinion indicates, there are to be no more prophesies. For example, in cases like Culver we can just arbitrarily assume that whenever someone dies or is injured the value of the future earnings they have lost is $1 million, or $10 million, or zero dollars. Or we can take the decedent’s previous year’s earnings, if it is not too much trouble to figure them out, and multiply that amount by some arbitrary number (perhaps the number of years the dead man’s father or grandfather lived), and we can forget about discounting future losses to present value. Which dollar figure or multiple of the last year of earnings that we arbitrarily assume will not matter, except of course to the parties themselves and to those who believe that the law ought to strive for results that seek to approximate reality, even when it requires a little prophesy.
*1339 The advantages of the majority’s method flow from the simplicity that comes from being arbitrary. The more arbitrary the assumption the less that application of it will be hindered by the reality of bothersome facts which are burdensome to find. Adopting this method will “provide! ] certainty and finality” and “bypass[ ] the unnecessary expenditure of judicial resources,” relieving courts of the burden of doing what courts are designed to do, which is find facts and apply the law to them. Maj. Op. at 1333. Writing the doctrine of ignoble ease into the law will have its advantages.
Of course, we are going to have to overrule some precedent, or perhaps in keeping with the majority’s decisional motif we can just arbitrarily assume that the conflicting precedent does not exist. The precedent established by the en banc Court in the Culver case nearly a quarter of a century ago will have to be thrown overboard, but it is just an admiralty decision anyway.
We will also have to get rid of the Meader ex rel. Long v. United States, 881 F.2d 1056 (11th Cir.1989), precedent and decisions like it. The Meader case arose under the Federal Tort Claims Act and involved the calculation of an award for future medical expenses and lost future earnings. We held, among other things, that “[i]t is a settled principle of law that [such] an award ... must be adjusted to its present value to account for two factors: first, the interest the award will earn before it is used to pay for medical expenses or to replace earnings; second, the depreciation the award will suffer over time on account of inflation.” Meader, 881 F.2d at 1057-58; see also Dempsey ex rel. Dempsey v. United States, 32 F.3d 1490, 1492 (11th Cir.1994) (FTCA medical malpractice case stemming from injuries to a newborn, required not only calculating an award for future medical expenses but also calculating a dollar value for the parent’s “loss of society and affection of the child” and their loss of the child’s services in the future).
Then there is our decision of just a few months ago in Advanced Telecommunication Network, Inc. v. Allen (In re Advanced Telecommunication Network, Inc.), 490 F.3d 1325 (11th Cir.2007). There the bankruptcy court had been faced with the difficulty of valuing a company’s contingent liability arising from pending litigation against it in state court. Not sure how the result of that litigation against the company could have been predicted, the bankruptcy court took the easy way out and arbitrarily assumed that the value of the contingent liability was zero. Id. at 1335-36. In reversing, we explained:
Although it may be true, as the bankruptcy court put it, that “no one could have predicted this result with any reasonable certainty,” such a precise prediction was not required. The court was instead required to calculate the present value of the liability — the expected cost of the liability times the estimated chance of it ever occurring. Unless either the expected cost or the chances of it occurring are equal to zero (that is, the liability is costless, or the chances of it happening are negligible), the estimated value should be more than zero.
Id. at 1335 (emphasis omitted).
The majority approach in the present case cannot be reconciled with our holding in the Advanced Telecommunication case. Requiring a district court to predict the amount of damages that may be awarded in a pending lawsuit and then to discount that amount by its estimate of the chance of a liability verdict is, the majority here would say, equivalent to “flip[ping] a coin” and is no better than “gaz[ing] into a crystal ball.” Maj. Op. at 1332. So, the *1340 Advanced Telecommunication decision, like so many others of ours that require estimating present value based on predictions about future events, will have to go. All of those prior precedents will have to yield to the easy arbitrary assumption method of valuation, to the judicial equivalent of the doctrine of ignoble ease.
Teddy Roosevelt is not the only one who extolled the virtue of toil and effort. Henry James once advised a young friend that, “I have in my own fashion learned the lesson that life is effort, unremittingly repeated, and ... I feel somehow as if real pity were for those who had been beguiled into the perilous delusion that it isn’t.” Letter from Henry James to Charles Eliot Norton (May 6, 1872), in 1 Henry James Letters, 1843-1875, at 276 (Leon Edel ed., 1974). I dissent from the majority’s perilous delusion.