In re PALISADES AT WEST PACES IMAGING CENTER, LLC, Debtor,

Janet G. Watts, as Chapter 7 Trustee, Plaintiff,

v.

MTC Development, LLC, Vinson Holding, Inc., Vinson Partners, L.L.L.P., Cynthia Vinson, Dana Vinson, The Trell Family Limited Partnership, Franklin P. Trell, Shaaron Trell, Project Personnel Leasing, LLC, and Sunbelt Construction Management, Inc., Defendants.

Bankruptcy No. 09–87600–WLH. Adversary No. 11–5235.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Nov. 13, 2013.

898

William Russell Patterson, Ragsdale Beals Seigler Patterson & Gray, Barbara B. Stalzer, Barbara Bell Stalzer, P.C., Atlanta, GA, for Plaintiff.

Howard D. Rothbloom, The Rothbloom Law Firm, Marietta, GA, for Defendants.

### ORDER AND JUDGMENT

WENDY L. HAGENAU, Bankruptcy Judge.

This matter came before the Court for trial on August 20–22, 2013 on the Trustee's Complaint for Avoidance of Fraudulent Conveyances under 11 U.S.C. § 544. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O). The parties stipulated in their Joint Pre–Trial Order that this Court could enter a final judgment in this case. After consideration of the evidence and arguments of counsel, the Court hereby enters judgment against the Defendants as follows:

| | |
|---|---|
| MTC Development, LLC | $2,009,399.65 |
| Sunbelt Construction Management, Inc. | $1,565,000.00 |
| Franklin P. Trell | $ 372,250.00 |
| Cynthia Vinson | $ 622,000.00 |
| Vinson Holding, Inc. | $ 622,000.00 |
| Vinson Partners, L.L.L.P. | $ 622,000.00 |
| The Trell Family Limited Partnership | $ 654,250.00 |
| Project Personnel Leasing, LLC | $-0- |
| Dana Vinson | $ 622,000.00 |
| Shaaron Trell | $-0- |

### Background

The parties entered into an extensive Joint Statement of Undisputed Facts [Docket No. 41] ("Undisputed Facts" or "UF"). The Court will not restate all the facts, but will summarize some of the more relevant ones for ease of understanding this Order. The Debtor, Palisades at West Paces Imaging Center ("Imaging Center" or "Debtor") was formed in 2002, with MTC Development, LLC ("MTC") owning 66% of the Imaging Center and Dr. William Stuart owning 34% of the Imaging Center. MTC was owned equally by Vinson Partners, L.L.L.P. ("VP") and The Trell Family Limited Partnership ("TFLP"). VP is owned by spouses Dana and Cynthia Vinson, while TFLP is controlled by spouses Franklin and Shaaron

Trell. The purpose of the Imaging Center was to own and operate an imaging facility on the third floor of the Palisades at West Paces building ("Building"). Physicians with offices in the Building could use the Imaging Center for their patients by "leasing" time on a MRI machine. In October 2002, the Debtor entered into a construction contract with Batson–Cook as a general contractor for demolition and build-out work on the third floor of the Building. At the time, the Debtor had applied for a loan with Merrill Lynch to fund the project. The loan did not close, however, and Batson–Cook ceased work on the project in January 2004. The Debtor then solicited funds through a private placement memorandum in mid–2004. As a result of the private placement memorandum, the Debtor raised approximately $2 million. By July 8, 2005, though, most of the investors had filed a lawsuit against the Debtor and its principals, Franklin Trell ("Mr. Trell") and Cynthia Vinson ("Ms. Vinson"), alleging fraud and seeking a full recovery of their investment.

While the litigation was pending, the Debtor continued with its plans to open the Imaging Center. It divided the third floor into three spaces with separate waiting rooms. In 2006, it signed a contract with Toshiba for a magnetic resonance imaging machine ("MRI") for $456,000.00. The Debtor also applied for a loan from CIT Healthcare Financing ("CIT"). The CIT loan to the Debtor closed on or about July 18, 2006, in the maximum amount of 110 percent of $3,819,850.00. CIT funded the loan in installments as follows: July 21, 2006, $1,350,000.00; August 28, 2006, $1,450,000.00; November 20, 2006, $1,019,850.00; and November 27, 2006, $18,792.68. The Toshiba machine was installed in Suite 300 of the Building in September 2006, and scans began running on the machine in November 2006.

Mr. Trell, one of Debtor's principals, testified the Toshiba machine did not operate as anticipated, and the doctors stopped using it and refused to pay their commitment for MRI scans. Mr. Trell testified that, as a result of the Toshiba machine's failure, the Imaging Center failed and ultimately filed bankruptcy. Notwithstanding this defense, attached to Toshiba's undisputed proof of claim in the case, is an order of summary judgment Toshiba obtained against the Debtor. The Debtor filed bankruptcy under Chapter 7 of the Bankruptcy Code on October 19, 2009. Janet Watts was appointed the Chapter 7 Trustee (the "Trustee"). By the time of the bankruptcy filing, the Debtor was the subject of a lawsuit by Batson–Cook, the original contractor; Partitions, the subsequent contractor retained by the Debtor; Toshiba for failure to pay for the MRI machine; and CIT. The Debtor settled the litigation with the investors in March 2007, completing the payment of the settlement in the summer of 2007 in the amount of $2,083,000.00 plus attorney's fees.

The Trustee filed this Complaint on May 2, 2011, seeking to recover a number of transfers allegedly fraudulent under 11 U.S.C. § 544 and § 548. The Trustee also alleged Mr. Trell and Ms. Vinson were the alter egos of the Debtor and therefore liable for the full amount of the claims filed in this case, including in excess of $11 million in unsecured claims and $300,000.00 in fees and administrative expenses. Through the Pre–Trial Order and again at the trial, the Trustee refined her claims and theories of recovery. The Trustee alleged, and the Defendants did not dispute, that the Debtor transferred $1,339,399.65 to MTC and $1,515,000.00 to Sunbelt Construction Management, Inc. ("Sunbelt") from the advances made by CIT on its loan. At the conclusion of the trial, the Trustee clarified that she sought the avoidance of these transfers only and recovery of those transfers from Mr. Trell,

his wife and TFLP, and Ms. Vinson, her husband, VP and Vinson Holding, Inc. ("VH"). The Trustee also continued to argue that Ms. Vinson and Mr. Trell were the alter egos of the Debtor and therefore liable for the full amount of all claims filed in the case, including $300,000.00 in Trustee and professional fees for a total requested judgment of $11,694,000.00.

The transfers made by the Debtor at issue in this case and the party to whom they were made is set out below. The Defendants do not dispute the Transfers. The transfers to MTC are referred to as "MTC Transfers", and the transfers to Sunbelt are referred to as "Sunbelt Transfers". Collectively, they are referred to as the "Transfers".

| Date | Amount | Transferee |
|------|--------|------------|
| July 25, 2006 | $ 300,000.00 | MTC |
| July 25, 2006 | $ 150,000.00 | Sunbelt |
| July 31, 2006 | $ 473,019.65 | MTC |
| August 30, 2006 | $ 175,000.00 | Sunbelt |
| September 14, 2006 | $ 297,085.00 | MTC |
| October 26, 2006 | $ 100,000.00 | MTC |
| November 8, 2006 | $ 100,000.00 | Sunbelt |
| November 9, 2006 | $ 169,295.00 | MTC |
| November 21, 2006 | $1,090,000.00 | Sunbelt |

### Findings of Fact

In addition to the Undisputed Facts, the facts set out in the Background above, and the facts set out in the Section 550 analysis below, the Court makes the following Findings of Fact:

### I. RELATIONSHIP AMONG DEFENDANTS AND RELATED COMPANIES

#### A. Vinson Entities

The Court finds the Vinsons owned and controlled VH and VP. Ms. Vinson testified that both VP and VH were used by her husband and her to pay their personal expenses. In particular, funds in the VH and VP accounts were used to buy a vacation home in Sevierville, Tennessee, which was placed in Mr. Vinson's name, and then to furnish and remodel the home. Cash from VH and VP was distributed to Mr. Vinson, used to purchase a motorcycle, used to make payments to a Ford dealership, and used to purchase a home in Newnan, Georgia.

#### B. Trell Entities

Mr. and Ms. Trell were partners in TFLP. They held signatory authority over its bank accounts and controlled its transfers.

#### C. Sunbelt

Mr. Trell and Ms. Vinson owned and controlled Sunbelt, either directly or indirectly.

#### D. Related Entities

MD Medical Equipment Company, LLC ("MD Medical") and Medical Development Group LLC ("MDG") were both formed in April 2008, after the events which form the basis of the Complaint. Prior to their official formation, Mr. Trell and Ms. Vinson represented that MDG and MD Medical provided equipment and other services to the Debtor. Mr. Trell and Ms. Vinson were in control of MDG and MD Medical, both before and after they were officially formed.

## E. *Books and Records*

Ms. Vinson was in charge of the books of the Debtor, MTC, Sunbelt, and Project Personnel Leasing LLC ("PPL"), as well as other companies she and Mr. Trell co-owned. Ms. Vinson authorized the payments from each company and the transfers between and among the companies.

## II. *CONSTRUCTION*

### A. *Sunbelt*

Sunbelt and the Debtor entered into an AIA contract (Pl. Ex. 13) dated June 1, 2002 for construction management services for the Imaging Center ("Construction Services Contract"). This Contract was entered into before Sunbelt was incorporated in July 2003. Pursuant to the terms of the Construction Services Contract, Sunbelt was to provide construction management services in two phases: a preconstruction phase for the cost of $50,000.00 and a construction phase for a cost of $125,000.00. The form contract includes a provision for payment on account of additional or optional services. However, in Section 13.3.1 of the Construction Services Contract, where the parties would fill in the cost of any such additional services, the contract is blank. No evidence was presented that the Construction Services Contract was ever amended.

On December 15, 2006, Sunbelt issued an invoice to MTC, not the Debtor, allegedly pursuant to the Construction Services Contract. (Def. Ex. HHA4 (partial) Sunbelt 12/15/06 Invoice). The invoice reflects the original amount due under the Construction Services Contract of $175,000.00, but charges for "extras" through October 15, 2006 of $132,750.00 plus reimbursables of $3,750.00. The invoice reflects that $235,000.00 had been previously paid on the Construction Services Contract. Handwritten notes on the December 15, 2006 invoice reflect the balance due was paid through a series of payments on November 21, 2006, December 19, 2006, January 2, 2007 and February 1, 2007. This December 15, 2006 invoice was submitted to CIT as part of the Debtor's proof of the use of funds and the outstanding amounts due.

### B. *Batson–Cook*

The Debtor entered into a construction contract with Batson–Cook as general contractor in October 2002. Batson–Cook ceased work on the project in January 2004 and work did not begin again until the Debtor entered into new contracts with Partitions.

### C. *Partitions*

Plaintiff's Exhibit 37 is a series of contracts between Partitions and the Debtor (or MTC on the Debtor's behalf) for construction on the three suites making up the Imaging Center. On August 16, 2006, Partitions agreed with the Debtor to construct *Suite 300* for $32,935.00.

On July 6, 2006, Partitions entered into an agreement with MTC, on behalf of the Debtor, for construction on *Suite 340* for an original contract sum of $288,485.00. A change order on November 15, 2006 added an additional $115,093.43 to the construction for Suite 340. This change order consists of Change Order No. 1 dated August 31, 2006 for $11,560.00; Change Order No. 2 dated August 31, 2006 in the amount of $31,283.00; and Change Order No. 3 dated November 15, 2006 in the amount of $72,250.43. An additional change order for Suite 340 is also dated November 15, 2006, adding another $31,845.60 to the construction cost of Suite 340. The Debtor's Ledger (Pl. Ex. 11A) ("Debtor's Ledger") shows the Debtor paid $145,935.00 to Partitions on September 14, 2006, which Plaintiff's Exhibit 37 shows as a credit on Suite 340. The Debt-

or's bank statements though show the payment was made on October 31, 2006 (Pl. Ex. 10A). The Court finds that, although the contract was in the name of MTC, it was an obligation of the Debtor as evidenced by the Debtor's partial payment of the liability.

The Debtor also entered into a construction contract with Partitions on October 19, 2006 for construction on *Suite 397* in the original amount of $23,880.00. A change order dated November 15, 2006 in the amount of $96,402.87 was submitted, making the total cost $120,282.87 for Suite 397.

## III. *CIT LOAN*

CIT loaned the Debtor money beginning July 2006. CIT's Credit Approval Memorandum ("Credit Memo") (Def. Ex. HHA4 (Partial) CIT Credit Approval Memo) reflects CIT's understanding that the purpose of the loan was to start up the business of the Imaging Center. In the Loan and Security Agreement (Pl. Ex. 20), CIT agreed to loan the Debtor a maximum of 110 percent of $3,819,850.00. In return, the Debtor pledged "Collateral" as security for the loan defined as follows:

> (a) all of Debtor's now existing or hereafter acquired or arising (a) Inventory, (b) Accounts, (c) General Intangibles, (d) Goods, (e) Chattel Paper, (f) Instruments, (g) Documents, (h) Equipment, (i) Investment Property, (j) Letter of Credit Rights, (k) Deposit Accounts, (*l*) other personal property and fixtures of any kind or nature, and (m) all products and Proceeds. For purposes of this Agreement and the other Loan Documents, the terms "Inventory", "Accounts", "General Intangibles", "Goods", "Chattel Paper", "Instruments", "Documents", "Equipment", "Investment Property", "Letter of Credit Rights", "Deposit Accounts", and "Proceeds" shall have the meanings assigned to

them under the Uniform Commercial Code.

Notwithstanding the pledge of collateral, the Credit Memo reflects CIT's understanding it was likely to be an undersecured creditor until the business of the Debtor was fully operational. CIT, in its collateral analysis in the Credit Memo, recognized "[t]he equipment would be a secondary form of repayment for the lease in a liquidation scenario. CIT is reliant upon the cash flow of the acquired center as the primary means of repayment, with the Assignment of the Lease Agreements considered as a peripheral enhancement." Nevertheless, the Debtor recognized CIT as a secured creditor in its schedules.

The Debtor provided documents to CIT prior to each funding allegedly showing that CIT's prior advances had been spent appropriately and that the Debtor had incurred expenses to support the next advance. The invoices supporting the MTC Deposited Checks (as defined below) were submitted to CIT in support of its funding.

## IV. *OPERATIONS*

### A. *Lease of Space*

The Debtor entered into a long-term lease for Suite 300 with Diagnostic Imaging Properties, LLC dated June 26, 2005. The principal of Diagnostic Imaging Properties, LLC was William Stuart, also part owner in the Debtor. The lease was for a 10–year term beginning July 1, 2005 and required minimum rent of $12,650.00 per month, or $150,000.00 per year.

### B. *Physician Agreements*

The physician leases ("Physician Agreements") which provided the revenue disclosed by the Debtor in its Statement of Financial Affairs and of which CIT took an assignment are entitled, "Lease Agreement". (Pl. Ex. 19). Each provides that

the doctor's office will use the MRI machine and the Imaging Center's services for a term of 10 years. The doctor's office agrees to pay a minimum amount each month for the use of the MRI machine, regardless of its actual use. This usage agreement is referred to as a "lease" of time on the machine. The agreement provides for additional charges for other uses of the MRI machine. The MRI machine remained at all times in the possession and ownership of the Imaging Center. Each of the Physician Agreements was guaranteed by individual physicians. The CIT Credit Memo referenced five Physician Agreements, while Plaintiff's Exhibit 19 includes only three such agreements. The three agreements included as Plaintiff's Exhibit 19 reflect $80,000.00 per month in revenue ($960,000.00 annualized), while the CIT Credit Memo anticipated annual net revenues of $1,800,000.00.

### C. *Revenue*

The Undisputed Facts state that the MRI machine was not installed until the fall of 2006, and there was no operating revenue for the Debtor until the MRI machine was installed. The Debtor's Statement of Financial Affairs reflects 2007 revenue of $139,500.00, all of which was identified as "revenue from leases". By 2008, the total revenue from leases was $84,104.27, and there was no revenue for the Debtor in 2009.

## V. *BALANCE SHEET FACTS*

### A. *Cash*

The Court used the cash balances on the Debtor's bank statements (Pl. Ex. 10A) in its insolvency analysis. The Court incorporates its statement of cash balances set out below as a finding of fact.

### B. *Leasehold Improvements*

The Court relied upon the "leasehold improvements" account in the Debtor's

Ledger (Pl. Ex. 11A) in assessing the value of the Debtor's leasehold improvements for the insolvency analysis. The beginning balance of the leasehold improvements account on January 1, 2005 was $124,285.98. The Debtor's Ledger reflects payments for various items related to the leasehold improvements, including the payments to Partitions on Suite 340, and payments for upholstery, cabling, sculptures and the like. With the exception noted in the insolvency discussion below, the Court accepts as true the entries in the Debtor's Ledger as to the value of the leasehold improvements and adopts those as findings of fact.

### C. *Dr. Stuart*

The Trustee admitted as Plaintiff's Exhibit 32A–F the proofs of claim filed in the Debtor's bankruptcy case. The Court finds, based on the Trustee's testimony, that the claims are allowed claims and represent valid liabilities of the Debtor on the dates represented in each proof of claim. One of the claims was filed by Dr. Stuart. The Court finds the Debtor owed Dr. Stuart $864,562.00 for loans made by Dr. Stuart to the Debtor between March 2006 and May 2006 (Pl. Ex. 32E). On August 30, 2006, the Debtor agreed to indemnify Dr. Stuart for any liabilities to Endover Palisades LLC for lease agreements associated with medical office space occupied by the Debtor. Ultimately, Endover Palisades LLC obtained a judgment against Dr. Stuart in the principal amount of $677,483.65 for suites occupied by the Debtor. (*See* Proof of Claim No. 5–1).

### D. *Toshiba*

Another claim was filed by Toshiba. The Toshiba MRI was installed and operational, according to the Undisputed Facts, in September 2006. At that point, the Debtor was liable to Toshiba for the full

cost of the MRI machine. Toshiba ultimately obtained a judgment against the Debtor in the amount of $450,369.59 of principal, plus interest and attorney's fees. (*See* Proof of Claim No. 4–1).

### E. *Batson–Cook*

The Undisputed Facts state that Batson–Cook was not fully paid and filed suit against the Debtor in January 2007. (UF No. 131). The Undisputed Facts do not state the amount Batson–Cook claimed. Plaintiff's expert stated Batson–Cook sued for $390,000.00. The Debtor listed Batson–Cook as a secured creditor on its Schedule D, filed on November 3, 2009 in the amount of only $61,000.00 based on a settlement agreement signed in October 2008. For purposes of this decision, the Court finds Batson–Cook was owed at least $61,000.00 at the time of each of the Transfers.

### F. *Related Entity Liability*

The Debtor's Ledger reflects liabilities to MTC in the amount of $168,550.00 beginning August 1, 2006. This balance was reduced to $68,555.28 on November 21, 2006, and the balance then increased in January and February 2007. The Debtor's Ledger reflects a payable to Mr. Trell of $32,500.00 beginning January 1, 2006 until it was paid in full on November 21, 2006.

### G. *Delinquent Payments*

The Court finds the Debtor was delinquent on the Batson–Cook liability when work ceased in January 2004. The Debtor was current on the liabilities to Dr. Stuart until 2008 or 2009. The Debtor was not delinquent on the payment to Toshiba until after the equipment was installed in September 2006. The Debtor was delinquent on the Partitions liabilities when the certificates of payment were submitted and not paid. The first application for Suite 397 was submitted on November 15, 2006; the

earliest application for payment on Suite 340 in evidence was submitted on December 8, 2006 and it was Application No. 4. (Pl. Ex. 37). There is no evidence of the date of the first application for payment on Suite 300. A demand letter was sent by Partitions on February 26, 2007.

### *Conclusions of Law*

### I. *FRAUDULENT CONVEYANCE*

Although the Trustee's Complaint seeks alternative recovery under 11 U.S.C. § 548, the Trustee recognizes that Section 548 does not apply to the Transfers which the Trustee is pursuing. Section 548 only applies to transfers made within two years before the date of the filing of the petition (October 19, 2009). The two-year look back period ends on October 19, 2007. All of the Transfers which the Trustee is pursuing as fraudulent occurred between July 25, 2006 and November 21, 2006, so Section 548 does not apply.

 Section 544 of the Bankruptcy Code, though, does provide a basis for recovery for the Trustee. Section 544(a) of the Bankruptcy Code allows a trustee to avoid any transfer of property of the debtor that is voidable by a hypothetical creditor that extends credit to the debtor as of the petition date and obtains either a judicial lien or an execution against the debtor. The trustee need not identify a specific creditor with that cause of action in order to recover under Section 544(a). Under Section 544(b), the trustee is authorized to avoid any transfer of an interest of the debtor in property that is voidable by a "creditor holding an unsecured claim that is allowable under Section 502 of this Title". Thus, under Section 544(b), the trustee asserts the claim of a specific, identified creditor whose claim is allowed or allowable under Section 502. It has long been held that a transfer which is avoidable under Section 544(b) is avoidable to

the full extent, not limited by the amount of the actual creditor's claim. *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931).

In this case, the Trustee seeks to use the Uniform Fraudulent Transfer Act ("UFTA") as enacted by Georgia, O.C.G.A. § 18–2–70, *et seq.* as the basis for avoiding the Transfers. Under Georgia's version of the UFTA, a creditor existing either before or after a conveyance may seek to avoid it as fraudulent if the transfer occurred: "(1) with actual intent to hinder, delay or defraud any creditor of the debtor, or" (2) the debtor did not receive reasonably equivalent value in exchange for the transfer and the debtor was "(A) engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." O.C.G.A. § 18–2–74(a). On the other hand, only a creditor whose claim existed at the time of the transfer may avoid a transfer under O.C.G.A. § 18–2–75(a) or (b). There, a creditor whose claim arose *before* the transfer was made may avoid the transfer if the debtor did not receive reasonably equivalent value in exchange for it and the debtor was insolvent at the time or became insolvent as a result of the transfer. O.C.G.A. § 18–2–75(a). Alternatively, a creditor whose claim arose *before* the transfer may avoid it "if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe the debtor was insolvent." O.C.G.A. § 18–2–75(b).

In this case, the Trustee has standing under both 11 U.S.C. § 544(a) and (b) to seek the avoidance of the Transfers. The Trustee stands in the shoes of a hypothetical creditor whose claim arose on the petition date in October 2009 under 11 U.S.C. § 544(a) and can assert claims under O.C.G.A. § 18–2–74(a). Under Section 544(b), the Trustee must stand in the shoes of an identified creditor whose claim remains unpaid and is allowable under Section 502 in order to assert a claim under O.C.G.A. § 18–2–75(a) and (b). Here, the Trustee identified at least two creditors that satisfy this requirement. The Trustee may step into the shoes of CIT, which filed Proof of Claim No. 3, whose claim increased with each advance made and who was a creditor prior to the date of each Transfer. Additionally, the Trustee may step into the shoes of Dr. Stuart, who filed Proof of Claim No. 5, stating that, as of the date of the first Transfer, July 25, 2006, the Debtor owed Dr. Stuart $864,562.00.

### A. *Insiders*

Before examining each Transfer, the Court will discuss which entities are insiders as defined by the Georgia UFTA. An "insider" is defined in O.C.G.A. § 18–2–71(7)(B) to "include" a director, an officer, a person in control of the debtor, or a relative of a director, officer or person in control of the debtor. Moreover, an insider also includes "an affiliate or an insider of an affiliate as if the affiliate were the debtor". O.C.G.A. § 18–2–71(7)(D). This definition of insider is the same as the definition of insider under the Bankruptcy Code. An affiliate is defined in the UFTA the same way it is defined in the Bankruptcy Code to mean a "person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor ..." or "a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the

debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor ...". O.C.G.A. § 18–2–71(1). Applying these definitions to the facts in the case, the following are insiders of the Debtor:

1. Ms. Vinson and Mr. Trell are insiders as the officers and persons in control of the Debtor.

2. Dana Vinson and Shaaron Trell are insiders as relatives of the officer or person in control of the Debtor, as they are the spouses of Ms. Vinson and Mr. Trell.

3. MTC is an insider because it is a person in control of the Debtor owning over 66 percent of it and is an affiliate and insider because it directly owns 20 percent or more of the Debtor.

4. TFLP and VP are affiliates and therefore insiders because they indirectly own 20 percent or more of the Debtor through their equal interests in MTC. TFLP and VP are insiders of the Debtor because they are insiders of the Debtor's affiliate, MTC, as persons in control of it. TFLP and VP are affiliates and therefore insiders of the Debtor because 20 percent or more of their stock is owned respectively by Mr. and Ms. Trell and Mr. and Ms. Vinson who indirectly own and control 20 percent of the Debtor.

5. Mr. and Ms. Vinson and Mr. and Ms. Trell are affiliates and therefore insiders because they indirectly own 20 percent or more of the Debtor through their ownership in TFLP and VP, which own MTC.

6. Sunbelt is an affiliate and insider because it is a corporation 20 percent of whose stock is indirectly owned or controlled by Mr. Trell and Ms. Vinson, who indirectly own and control 20 percent of the Debtor.

7. VH is an affiliate and therefore insider because 20 percent or more of its stock is owned directly by Mr. and Ms. Vinson, who indirectly own and control 20 percent of the Debtor.

In short, all of the remaining Defendants are insiders of the Debtor pursuant to O.C.G.A. § 18–2–71.[1]

### B. *Insolvency*

The Trustee argues the Debtor was insolvent at the time of each Transfer. A debtor is insolvent under O.C.G.A. § 18–2–72, "if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation" or if the debtor "is generally not paying his or her debts as they become due." O.C.G.A. § 18–2–72(a) and (b). The term "Assets" under the UFTA does not include "[p]roperty to the extent it is encumbered by a valid lien". O.C.G.A. § 18–2–71(2). The term "Debts" under the UFTA does not "include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." O.C.G.A. § 18–2–72(e).

In support of the Trustee's allegation that the Debtor was insolvent, the Trustee elicited the testimony of Spence Shumway as an expert in forensic accounting and insolvency analysis. Mr. Shumway testified the Debtor was insolvent at all times and submitted his report without objection (Pl. Ex. 1, hereinafter "Expert Report") to substantiate this opinion. Mr. Shumway's opinion of insolvency was initially based on his belief that by July 2006 the Debtor was over $10 million in debt but had no operations and no proven track record on which to base any expectation of operations. His opinion was also based on the Debtor's statement of financial affairs filed in con-

---

1. The Trustee did not pursue any claims against PPL, even though it is named as a Defendant.

nection with the bankruptcy case, which showed that, even in 2007, the Debtor's income from operations was only $139,500.00. Since Mr. Trell testified the business did not begin until November 2006, any revenues in 2006 would have been minimal. Finally, Mr. Shumway based his opinion on the private placement memorandum (Pl. Ex. 17, including 17A–17C), which stated that the Debtor's assets were insignificant.

On cross examination, however, Mr. Shumway had to acknowledge the private placement memorandum was written in 2004, before the Debtor purchased the Toshiba machine and before the Debtor entered into the Physician Agreements for the use of the machine. Mr. Shumway testified he did not assign any value to the Physician Agreements and then revised his debt estimate down to $3.5 million, but noted the amount of the Debtor's debt increased with each draw from CIT.

■ The Defendants made valid points impeaching Mr. Shumway's testimony, particularly with respect to his failure to update the value of assets. It would have been helpful for Mr. Shumway to create a balance sheet for the Court, but the evidence submitted by the Trustee nevertheless shows that the Debtor was insolvent at the time of each of the Transfers.

While the definition of insolvency seems straightforward, several provisions of the UFTA and principles of interpretation from case law are important in applying the definition to the facts of this case. First, the applicable date for determining insolvency is the date of the Transfer. *See In re WRT Energy Corp.*, 282 B.R. 343, 368 (Bankr.W.D.La.2001). Secondly, the UFTA defines a "debt" as "liability on a claim". O.C.G.A. § 18–2–71(5). A "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

legal, equitable, secured, or unsecured." O.C.G.A. § 18–2–71(3). "Debts ... do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." O.C.G.A. § 18–2–72(e). An "asset", on the other hand, means "property of a debtor". O.C.G.A. § 18–2–71. An asset though does not include "property to the extent it is encumbered by a valid lien". O.C.G.A. § 18–2–71(2)(A). Thus, to the extent a claim is secured by property of the debtor, the collateral is excluded from the calculation of assets and the liability is excluded from the calculation of debts.

■ The UFTA instructs further that the value of the debtor's property is to be calculated "at a fair valuation". O.C.G.A. § 18–2–72(a). This is the same phrase used in the definition of insolvency in the Bankruptcy Code. 11 U.S.C. § 101(32). The court must first determine whether the debtor's assets should be valued on a going-concern basis or on a liquidation basis. Only then may the court conduct a fair valuation and assign a value to the debtor's assets. *See WRT*, 282 B.R. at 368–69. Although the Imaging Center had not yet begun operations, this Court will use a going-concern value for the Debtor. Both the Debtor and CIT at the time it made the loan to the Debtor thought the Debtor was about to be a going concern, even though operations had not yet begun. Moreover, the Debtor was not on the verge of bankruptcy and in fact did not file bankruptcy for another three years. Further, using the going-concern valuation provides the Defendants with the maximum benefit as to the value of the Debtor's assets. *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3rd Cir.1992). "Fair valuation, in the context of a going concern, 'contemplate[s] an estimate of proceeds realizable within a reasonable timeframe through either collection or sale

at regular market value.' " *In re TOUSA, Inc.*, 422 B.R. 783, 858 (Bankr.S.D.Fla. 2009) *rev'd on other grounds*, 444 B.R. 613 (S.D.Fla.2011), *rev'd in part and aff'd in part on other grounds*, 680 F.3d 1298 (11th Cir.2012). "Because 'a fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time,' the valuation 'should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts.' " 422 B.R. at 859 (*citation omitted*).

■ On the liability side of the balance sheet, the Court must evaluate the liabilities that existed as of the date of each Transfer. The Eleventh Circuit in *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325 (11th Cir.2007) held that in valuing contingent liabilities, the bankruptcy court is to calculate the present value of the liability by taking the expected cost of the liability times the estimated chance of it ever occurring. *Id.* at 1335. "Unless either the expected cost or the chances of it occurring are equal to zero (that is, the liability is costless, or the chances of it happening are negligible), the estimated value should be more than zero." *Id. See also WRT*, 282 B.R. at 370.

On the asset side of the equation, the Court reviewed the testimony and exhibits for any evidence of an asset that could be converted to cash in the ordinary course of business and used to pay debts. Based on the Court's review of the evidence, the Court identified the following asset categories: cash, leasehold improvements, furniture and office equipment, the Toshiba machine once it was installed in September 2006, a long-term lease for Suite 300 executed by the Debtor, and the Physician Agreements.

As discussed above, the Debtor and CIT entered into a Loan and Security Agreement on July 18, 2006, in which the Debtor pledged virtually all its personal property and the Physician Agreements as collateral for the loan. It is clear in the CIT Credit Memo that CIT relied on the Physician Agreements and personal property in making the loan. The Debtor scheduled CIT as an undisputed secured creditor. The Court holds that CIT held a valid security interest in all of the Debtor's personal property, other than its bank accounts, on the dates of the Transfers. The Court has excluded the Debtor's bank accounts from CIT's collateral because perfection in a deposit account can only be made by a deposit control agreement executed in accordance with O.C.G.A. §§ 11–9–104, 11–9–314. No evidence of such an agreement has been presented. Since CIT was and remained undersecured, the property serving as CIT's collateral is excluded from the definition of asset pursuant to O.C.G.A. §§ 18–2–71(2)(A) and 18–2–72(e).[2]

The Debtor's assets not serving as CIT's collateral are cash, leasehold improvements and a long-term lease. For cash, the Court used the balance in the Debtor's bank account per the bank statements. (Pl. Ex. 10A). The Court also included leasehold improvements as an asset at the amount identified in the Debtor's Ledger (Pl. Ex. 11A).[3]

**2.** The CIT Credit Approval Memo notes the loan is undersecured without cash flow from the business operations.

**3.** The Court has assumed the leasehold improvements identified in the Debtor's Ledger are realty and not personalty and as such must be perfected as realty and not with a UCC filing. This assumption is consistent with the Debtor posting construction payments in this ledger account and with the CIT Loan and Security Agreement which never refers to interests in realty or to any real estate-based agreements. This assumption provides Defendants with the benefit of increased asset value in the insolvency analysis.

■ Finally, the Court considered whether the long-term lease for Suite 300 executed by the Debtor could be considered an asset. As courts have noted, long-term leases are both a liability and a potential asset. *In re Doctors Hosp. of Hyde Park*, — B.R. —, —, 2013 WL 5524696, *86 (Bankr.N.D.Ill.2013); *In re Labrum & Doak, LLP*, 227 B.R. 383, 389 (Bankr.E.D.Pa.1998). The court in *Doctors Hosp.*, agreed that long-term lease payments could be included in liabilities, but stated that then the present value of the long-term lease must also be included as an asset. The Court notes that Debtor's Ledger includes rent accrual and option expense of approximately $43,000.00 per month. The Debtor's Ledger reflects the accrued amount due on August 1, 2006 was $714,895.75 and the amount due by December 31, 2006 was $348,701.45. The Debtor's bankruptcy schedules do not identify the lease as an asset or liability. The Court has therefore decided to exclude the long-term lease as both an asset and a liability. This decision, again, gives the Defendants the benefit of the doubt, as the Court believes the long-term liability of this lease greatly exceeds any value it may have, particularly since the landlord was an insider of the Debtor.

As to liabilities, the Court has relied upon the stipulated facts of the parties and the proofs of claim which the Trustee testified that she did not dispute. The Court is excluding from its insolvency calculations the entire CIT debt of $4,759,814.64 indicated on the CIT proof of claim, (Pl. Ex. 32C), even though it is clear that CIT expected to be, and was in fact, undersecured. Because the Court does not have sufficient evidence from which to make a finding as to the precise amount of CIT's unsecured claim, the Court is excluding all of CIT's debt and not just the secured portion determined by the value of CIT's Collateral. This gives the Defendants the benefit of the doubt on this issue.

In evaluating the other liabilities, the Court has fixed the amount of the Debtor's liability to Batson–Cook at $61,000.00 based on Debtor's Schedule D [Docket No. 10] and liability to Partitions based on its proof of claim (Pl. Ex. 32B), the testimony of Dan Davis, president of Partitions, and the AIA contracts for work to be performed by Partitions. (Pl. Ex. 37). The Court notes the Debtor's Ledger reflects certain debt to MTC and to Mr. Trell personally, which the Court also reflects in the balance sheet.

The Court evaluated the Debtor's liability to the investors who invested almost $2 million in the company in the summer and fall of 2004. By the summer of 2005, all but one of the investors had filed a lawsuit against the Debtor, seeking a return of their $1,850,000.00 investment. Ultimately, this lawsuit was settled in 2007, after the Transfers at issue took place, with payment in full to the investors plus payment of their attorneys' fees. According to the Eleventh Circuit decision in *Advanced Telecom.*, the Court is to evaluate the liability times the probability of liability as the parties would have seen it at the time of the Transfers in the summer and fall of 2006. 490 F.3d at 1335. Clearly, the potential liability to the Debtor was the amount of the lawsuit, $1,850,000.00. The Court has assigned a 50% probability that the Debtor would have been liable to the investors. As with other assumptions made by the Court, the Court believes it is being generous to the Defendants, given that the Debtor ultimately repaid the $1,850,000.00 investment in full plus attorney's fees in 2007.

The Debtor's liability to Dr. Stuart is based on his proof of claim. (Pl. Ex. 32E and Proof of Claim No. 5–1). The initial liability of the Debtor to Dr. Stuart was $864,562.00. The indemnification liability undertaken by the Debtor on August 30,

2006 was a contingent liability. Like the liability to the investors, the Court must assess the potential liability times the probability of liability. The potential liability was $677,483.65 plus fees, interest and costs. Since the Debtor was a start-up venture, and knowing that the Debtor ultimately became liable for the full amount, the Court has also used a 50% probability for this debt.

The Court's analysis as to the Debtor's solvency under the balance sheet test on each date of a Transfer is set out in Exhibit A hereto. Based on the attached analysis, the Court concludes that the Debtor was insolvent on the date of each Transfer.

Despite the Court finding that the Debtor was insolvent based on the balance sheet test, the Court cannot conclude the Debtor was not paying its debts as they came due. The Batson–Cook debt was past due, but the Debtor's Ledger reflects no accounts payable to speak of, and the Debtor was paying the Dr. Stuart debt as it came due in the fall of 2006. The CIT debt had not come due at the time of the Transfers at issue. The Toshiba machine was installed and the Debtor was fully liable to Toshiba, but no evidence of payment terms was admitted. Similarly, the Court does not have sufficient evidence to conclude the Debtor was left with an unreasonably small amount of capital after each Transfer because there was no evidence presented as to the amount of capital that would be required for Debtor's operation. Finally, the Court cannot form a conclusion as to whether the Debtor intended to incur debt beyond its ability to pay. In this situation, the Debtor was not yet operational or, by the last Transfer, had just begun operations, so there is no operational history on which to base such a finding. Clearly, CIT, in making the loan, put some stock in the Debtor's projections which showed an ability to generate cash sufficient to pay the debts that were in-

curred. The Court, however, does not have the projections as evidence, nor any testimony about them from which to make that conclusion.

Nevertheless, the Court concludes the Debtor was insolvent based on the balance sheet test on the date of each Transfer.

### C. Transfers to Sunbelt

The Debtor made the following Sunbelt Transfers:

| | |
|---|---|
| July 25, 2006 | $ 150,000 |
| August 30, 2006 | $ 175,000 |
| November 8, 2006 | $ 100,000 |
| November 21, 2006 | $1,090,000 |

Sunbelt does not dispute the Sunbelt Transfers, but claims that each was in payment of the construction management fee allegedly due to Sunbelt or for reimbursement of some other expenses. Sunbelt points to its Construction Services Contract and the December 15, 2006 invoice as support for payment.

But the facts do not substantiate Sunbelt's claims. At Section 13.3.1 of the Construction Services Contract, where the parties could fill in the cost of any additional services, the contract is blank. Since there was no agreement for the cost of "extras", there is no basis for the increased billing. The only testimony on the increased charges was Ms. Vinson's opinion that extra charges were justified because the construction project lasted longer than anticipated. Her testimony did not account for the fact no work occurred on the construction project for at least two years between the time Batson–Cook left in 2004 and Partitions began in August 2006. The Debtor's Ledger under the category "construction management" reflects only two payments made to Sunbelt: on July 27, 2006 for $150,000.00 (the first Sunbelt Transfer) and on November 8, 2006 for $100,000.00 (the third Sunbelt Transfer), suggesting the Debtor did not view all the Sunbelt Transfers as payments for construction management.

The Trustee argues that, because the principals of Sunbelt and the principals of the Debtor are the same, there is no basis for payment of a construction management fee, and no reasonably equivalent value for any of the Sunbelt Transfers. That is not necessarily the case, as it is possible the payment for Ms. Vinson's and Mr. Trell's time on the construction of the Debtor's premises was funded by making payment to Sunbelt rather than making a salary payment to Mr. Trell and Ms. Vinson directly. Both Milan Vancura, the architect on the project, and Dan Davis, the president of Partitions, testified that Ms. Vinson was the point person in all of their construction work. The Court therefore concludes that Sunbelt provided reasonably equivalent value to the Debtor in the amount of $175,000.00, as stated in the original Construction Services Contract. The Court finds no evidence to support any reasonably equivalent value in excess of the $175,000.00 contract price since there is no evidence as to what the "extras" were, the cost of the "extras", or even a contractual basis for the extra charges. According to the Debtor's Ledger, then, the Transfer on July 25, 2006 of $150,000.00 was for payment of the amount due under the Construction Services Contract and $25,000.00 of the $100,000.00 Transfer made on November 8, 2006 was also in payment for the Construction Services Contract. The Court has already concluded the Debtor was insolvent at the time of each of the Transfers. The Court therefore concludes, under 11 U.S.C. § 544 and O.C.G.A. § 18–2–75(a), that Sunbelt Transfers in the amount of $1,340,000.00 are avoided.

Alternatively, the Court finds that 100% of the Sunbelt Transfers, $1,515,000.00, are avoidable under O.C.G.A. § 18–2–75(b) and 11 U.S.C. § 544. As concluded above, Sunbelt is an insider of the Debtor. Even under Sunbelt's version of the facts, the Sunbelt Transfers were for payment of construction management fees and other expenses and therefore were for antecedent debt. The Court has previously concluded the Debtor was insolvent on the date of each of the Sunbelt Transfers. Finally, the Court concludes Sunbelt had reasonable cause to believe the Debtor was insolvent at the time the Sunbelt Transfers were made. Sunbelt and the Debtor were controlled by the same two people, Cynthia Vinson and Franklin Trell. Both of them knew the condition of the Debtor, the liabilities owed, and the assets owned. Cynthia Vinson was in charge of the books of both companies and authorized the payments and transfers that were made. Therefore, 100% of the Sunbelt Transfers are avoided under O.C.G.A. § 18–2–75(b) and 11 U.S.C. § 544.

### D. MTC Deposited Checks

The Trustee alleges the following three Transfers were made via a check payable from the Debtor to entities other than MTC, but in each instance the check was deposited in the MTC Account ("MTC" Deposited Checks).

| | | |
|---|---|---|
| July 31, 2006 | $473,019.65 | Payable to MDG |
| September 14, 2006 | $297,085.00 | Payable to MDG |
| November 9, 2006 | $169,295.00 | Payable to MD Medical |

The Defendants do not dispute the checks were payable as set out or deposited in the MTC account.

The Court first concludes that all three Transfers are avoidable under O.C.G.A. § 18–2–75(b) and 11 U.S.C.

§ 544. The undisputed testimony was that Mr. Trell and Ms. Vinson were not only in control of the Debtor, but also controlled MDG and MD Medical. As such, both MDG and MD Medical satisfy the definition of affiliate and therefore insider under the UFTA. The Defendants contend the MTC Deposited Checks were in payment of valid expenses. Assuming the Defendants are correct, the MTC Deposited Checks were on account of antecedent debt and thus avoidable. Finally, the Court earlier found the Debtor insolvent on the dates of each of the MTC Deposited Checks. As with Sunbelt, the Court concludes that MD Medical and MDG had reasonable cause to believe the Debtor was insolvent at the time of the Transfers of the MTC Deposited Checks because each was controlled by the same two people, Mr. Trell and Ms. Vinson. Consequently, each of the three MTC Deposited Checks is avoided under O.C.G.A. § 18–2–75(b) and 11 U.S.C. § 544.

■ The Court also concludes that each of the three MTC Deposited Checks is avoidable under O.C.G.A. § 18–2–75(a) and 11 U.S.C. § 544. The Court concludes the Debtor did not receive reasonably equivalent value for any of the MTC Deposited Checks. The undisputed testimony was that neither MDG nor MD Medical existed at the time the checks were written to them. Secondly, the checks were deposited into the account of MTC and not in any account for the other two entities. The Court can find no evidence that MTC then used those funds to pay any valid expenses of the Debtor. There is absolutely no evidence the Debtor received any value as a result of the MTC Deposited Checks. Finally, the Court previously found the Debtor insolvent at the time of the Transfers. Each of the MTC Deposited Checks is avoided under O.C.G.A. § 18–2–75(a) and 11 U.S.C. § 544.

■ Finally, the Court finds that each of the MTC Deposited Checks is avoidable under O.C.G.A. § 18–2–74(a)(1) and 11 U.S.C. § 544 because the Transfers were made by the Debtor with actual intent to hinder, delay or defraud a creditor, particularly CIT. The testimony of Ms. Vinson was that each of the invoices supporting the MTC Deposited Checks was presented to CIT as part of the support for funds previously advanced and in support of the next draw request. The UFTA, O.C.G.A. § 18–2–74(b), provides factors for the Court to consider in determining whether a transfer is made with actual intent to hinder, delay or defraud a creditor. First, the MTC Deposited Checks were to an insider. Secondly, the MTC Deposited Checks were not fully disclosed. To the outside world, it appeared the Debtor had purchased equipment or incurred debt to a third-party company, when instead the funds were deposited in MTC, the 66% owner of the Debtor. The true transferee was therefore concealed. Moreover, neither MDG nor MD Medical was in existence, another fact not disclosed to CIT. The Court has already found that the Debtor received no consideration for the transfer of the MTC Deposited Checks and the Debtor was insolvent at the time. Finally, the Court is left with the firm belief the MTC Deposited Checks, and any invoices which allegedly support them, were created by Ms. Vinson and Mr. Trell in order to defraud CIT into making advances for expenses not validly incurred. The Court therefore concludes the transfer of the MTC Deposited Checks is avoidable under O.C.G.A. § 18–2–74(a)(1) and 11 U.S.C. § 544.

### E. *Other Transfers to MTC*

Finally, the Trustee alleges the following Transfers from the Debtor to MTC are avoidable ("MTC Other Transfers"):

July 25, 2006 $300,000
October 26, 2006 $100,000

In response, MTC claims the MTC Other Transfers were made to reimburse MTC for expenses paid by MTC on the Debtor's behalf. Accepting MTC's position as true, the Court nevertheless concludes the Transfers are avoidable under O.C.G.A. § 18–2–75(b) as payments on account of an antecedent debt to an insider (MTC) at a time when the Debtor was insolvent. As with the other insiders, the Court concludes MTC had reasonable cause to believe the Debtor was insolvent because of its control by Mr. Trell and Ms. Vinson. Therefore, the Court avoids the $400,000 MTC Other Transfers pursuant to O.C.G.A. § 18–2–75(b) and 11 U.S.C. § 544.

The Trustee also alleges the MTC Other Transfers should be avoided because the Debtor did not receive reasonably equivalent value. The Court concludes the Trustee has not met her burden of proof on this allegation. Even the Trustee's expert testified that MTC spent some money on the Debtor's behalf. The Defendants' exhibits include numerous invoices, many of which appear to be valid expenses incurred on the Debtor's behalf. The Court notes further that the Debtor ultimately began operations, so there is no doubt that some money was spent to obtain items for the Debtor's operations. On the other hand, the Court is convinced that not all of the MTC Other Transfers were in exchange for reasonably equivalent value. But, based on the evidence presented, there is no way the Court can determine the amount of reasonably equivalent value received by the Debtor in exchange for the MTC Other Transfers. Therefore, the Court denies the Trustee's claim to avoid the MTC Other Transfers pursuant to O.C.G.A. § 18–2–75(a).

## II. RECOVERY OF AVOIDED TRANSFERS

The Court has determined that the Transfers are avoidable under 11 U.S.C. § 544. Now the Court must consider from whom the Trustee can recover the avoidable Transfers under 11 U.S.C. § 550. This section provides,

... to the extent that a transfer is avoided under section 544 ..., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). An initial transferee is the initial recipient of the transfer provided it "exercise[s] legal control over the assets received, such that they have the right to use the assets for their own purposes, and not ... [as] a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee." *In re Pony Express Delivery Servs., Inc.,* 440 F.3d 1296, 1300 (11th Cir. 2006). The terms "immediate" and "mediate" transferee are not defined in the Bankruptcy Code. However, "[a]s a general rule, § 550(a) imposes liability on all recipients in a chain of transfers of fraudulently-conveyed property." *In re Bauer,* 318 B.R. 697, 700 (Bankr.D.Minn.2005) (citation omitted). An immediate or mediate transferee is "one who takes in a later transfer down the chain of title or possession." *In re Knippen,* 355 B.R. 710, 728 (Bankr.N.D.Ill.2006) (citation omitted) aff'd *Knippen v. Grochocinski,* 2007 WL 1498906 (N.D.Ill.2007). The immediate transferee is the one who receives a transfer from the initial transferee and all other recipients are mediate transferees. *See In*

*re Appleseed's Intermediate Holdings, LLC,* 470 B.R. 289, 301 (D.Del.2012) (citation omitted).

■■■ The immediate or mediate transferee may be identified by tracing the funds from the initial transferee. Commingling funds does not prohibit tracing. *See In re Int'l Admin. Servs., Inc.,* 408 F.3d 689 (11th Cir.2005); *Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.,* 409 F.3d 1049 (8th Cir.2005) (applying state law). "[P]roper tracing does not require dollar-for-dollar accounting." *Int'l Admin. Servs.,* 408 F.3d at 708 (*citations omitted*). *See also In re Allou Distribs., Inc.,* 379 B.R. 5 (Bankr.E.D.N.Y.2007). The fact that funds are transferred multiple times does not prohibit the Court from tracing the funds to the ultimate transferee. "It is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified." *Int'l Admin. Servs.,* 408 F.3d at 709 (citations omitted).

Bankruptcy courts have analyzed tracing in several contexts, including recovery under Section 550, and have used different approaches. *See In re A'Hearn,* 2012 WL 1378467 (Bankr.N.D.Iowa 2012) (using the lowest intermediate balance approach plus looking at the timing and amount of the payments); *In re 1031 Tax Grp., LLC,* 439 B.R. 78 (Bankr.S.D.N.Y.2010) (employing a pro rata allocation where multiple victims claimed the funds); *In re Real Estate Exch. Servs., Inc.,* 2009 WL 6499249 (Bankr.N.D.Ga.2009) (using lowest intermediate balance approach); *Gen. Elect. Capital Corp.,* 409 F.3d at 1049 (using the lowest intermediate balance approach); *In re Mushroom Transp. Co., Inc.,* 227 B.R. 244 (Bankr.E.D.Pa.1998) (employing a first in, first out analysis in accordance with Pennsylvania law, but modifying the approach to assume that the tortfeasor withdrew legitimate funds before withdrawing the proceeds of transfers and that, once

the proceeds of the transfers were spent, new deposits were not treated as replenishing the trust proceeds).

■■ In conducting the tracing analysis below, this Court has employed the lowest intermediate balance approach but has additionally assumed that, if the amount and timing of the transfers are clear (i.e., the transfers into and out of a commingled account are in the same or lesser included amount and on the same day), the same funds were being transferred, even if the funds passed through commingled accounts. In keeping with the analysis of other courts, the Court also assumes that, when transferred funds are deposited into a commingled account, the non-transferred funds are used first and that, once the transferred funds are spent entirely, they are not replenished. With this background, the Court will now review liability under Section 550.

### A. Initial Transferee

In this case, there is no dispute that the initial transferee of the Sunbelt Transfers is Sunbelt, and the initial transferee of the MTC Other Transfers and MTC Deposited Checks is MTC. Not only were the funds initially deposited into those respective accounts, but there was no dispute that the recipient had the authority to dispose of the funds and in fact did so. Sunbelt is therefore liable for the Sunbelt Transfers in the amount of $1,515,000.00 as the initial transferee, and MTC is liable for the MTC Other Transfers and the MTC Deposited Checks in the amount of $1,339,399.65 as the initial transferee.

### B. Immediate and Mediate Transferees of Sunbelt Transfers

#### 1. July 26, 2006 Transfer of $150,000

The Court concludes the immediate transferee of the $150,000.00 Transfer from the Debtor to Sunbelt is TFLP. The mediate transferee is MTC. The evidence

shows that the $150,000.00 Transfer to Sunbelt was deposited in Sunbelt's account on July 27, 2006, and on the same day electronically transferred from Sunbelt. (Pl. Ex. 10D). The evidence also shows that $150,000.00 was received by TFLP on July 27, 2006 and transferred out the same day. (Expert Report: Ex. IV, Schedule 1, Ex. A, p. 2/42). The MTC 2006 Ledger for the period dated January 1, 2006 through December 31, 2006 (Pl. Ex. 11C) ("MTC 2006 Ledger") reflects the receipt of $150,000.00 from TFLP on July 27, 2006. The MTC bank statements are consistent. (Pl. Ex. 10B).

### 2. *August 30, 2006 Transfer of $175,000.00*

The Court concludes the immediate transferee of the $175,000.00 Transfer from the Debtor to Sunbelt was VP. Undisputed Fact No. 78 is, "On September 9, 2006, Sunbelt transferred $175,000 to VP". The Court notes the ending balance on August 30, 2006 in the Sunbelt account was $175,054.62. There were no deposits into the Sunbelt account in September 2006, so the only source for the $175,000.00 Transfer to VP was the funds from the Debtor. (Pl. Ex. 10D).

### 3. *November 8, 2006 Transfer of $100,000*

The Court concludes VP is the immediate transferee of $70,000.00 of this Transfer and MTC is the immediate transferee of $30,000.00 of this Transfer. Before the $100,000.00 Transfer to Sunbelt, the Sunbelt account held only $54.62. (Pl. Ex. 10D). No other deposits were made to the Sunbelt account until the next Sunbelt Transfer on November 21, 2006. (Pl. Ex. 10D). On November 8, 2006, the same day as the Transfer to Sunbelt, $25,000.00 was transferred to VP. (Pl. Ex. 10D; Expert Report: Ex. IV, Schedule 2, Ex. J, p.

7/26). On the next day, November 9, 2006, $15,000.00 was transferred to VP. (Expert Report: Ex. IV, Schedule 2, Ex. J, p. 9/26–10/26). On November 17, 2006, $10,000.00 was transferred to VP, and on November 21, 2006, $20,000.00 was transferred to VP. (Expert Report: Ex. IV, Schedule 2, Ex. J, pp. 11/26–14/26). The remaining $30,000.00 of the Transfer from the Debtor to Sunbelt was transferred to MTC on November 9, 2006. (Pl. Ex. 11C; Pl. Ex. 10D and Pl. Ex. 10B).

### 4. *November 21, 2006 Transfer of $1,090,000*

When this Transfer was deposited in Sunbelt's account, only $54.62 was in the account. No other deposits were made into the Sunbelt account until February 28, 2007. (Pl. Ex. 10D). The Court concludes VP is the immediate and mediate transferee of $205,000.00. TFLP is the immediate and mediate transferee of $140,000.00 of this Transfer. MTC is the immediate or mediate transferee of $490,000.00. These totals are the result of the following calculations.

### a. *Vinson Partners as immediate transferee*

VP was the immediate transferee from Sunbelt of $20,000.00 on December 6, 2006 and of $100,000.00 on February 15, 2007. (Expert Report: Ex. IV, Schedule 2, Ex. J, pp. 15/26–18/26).

### b. *MTC as immediate transferee and TFLP and VP as the mediate transferees thereof*

Based on the evidence, the Court concludes significant funds from this Sunbelt Transfer were transferred from Sunbelt to MTC and then from MTC to TFLP or VP. Each will be reviewed below.

● On December 4, 2006, Sunbelt transferred $80,000.00 to MTC,[4] which, on

---

4. The MTC 2006 Ledger states the transfer came from and went to TFLP on December 4, 2006. The TFLP bank statements do not support the funds coming *from* TFLP, only to TFLP, while the Sunbelt bank statements re-

the same date, transferred $80,000.00 to TFLP. (Pl. Ex. 10B; Pl. Ex. 11C; Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 31/42–32/42).

- On December 8, 2006, Sunbelt transferred $50,000.00 to MTC. (Pl. Ex. 11C: Pl. Ex. 10D; and Pl. Ex. 10B).
- On December 11, 2006, Sunbelt transferred $25,000.00 to MTC. (Pl. Ex. 11C; Pl. Ex. 10D; Pl. Ex. 10B).
- MTC, on December 11, 2006, transferred $10,000.00 to VP. The only funds in MTC's bank account at the time were a $16,939.97 balance of the $50,000.00 transferred on December 8, 2006, and the $25,000.00 transferred on December 11, 2006. (Expert Report: Ex. IV, Schedule 2, Ex. F, pp. 27/50–29/50).
- On December 15, 2006, Sunbelt transferred $30,000.00 to MTC and, on the same date, MTC transferred $15,000.00 of that to TFLP and $15,000.00 to VP. (Pl. Ex. 11C; Pl. Ex. 10D; Pl. Ex. 10B; and Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 33/42–34/42, and Schedule 2, Ex. F, pp. 30/50–31/50).
- On December 21, 2006, Sunbelt transferred $40,000.00 to MTC, $30,000.00 of which was immediately transferred to VP. (Pl. Ex. 11C; Pl. Ex. 10D; Pl. Ex. 10B; and Expert Report: Ex. IV, Schedule 2, Ex. F, pp. 32/50–33/50).
- On January 2, 2007, Sunbelt transferred $50,000.00 to MTC, which then transferred $15,000.00 to TFLP. (Pl. Ex. 10D; Pl. Ex. 10B; Pl. Ex. 11F (MTC Journal Jan. 1, 2007–Dec. 31, 2007 ("MTC 2007 Journal")); and Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 35/42–36/42).

- On January 5, 2007, Sunbelt transferred $50,000.00 to MTC. (Pl. Ex. 10D; Pl. Ex. 10B).
- On January 16, 2007, Sunbelt transferred $30,000.00 to MTC, which on the same day paid $15,000.00 to TFLP and $15,000.00 to VP. (Pl. Ex. 10D; Pl. Ex. 10B; Pl. Ex. 11F; and Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 37/42–38/42 and Schedule 2, Ex. F, pp. 37/50–38/50).
- On January 18, 2007, Sunbelt transferred $55,000.00 to MTC. (Pl. Ex. 10D; Pl. Ex. 10B; and Pl. Ex. 11F).
- On January 29, 2007, Sunbelt transferred $50,000.00 to MTC. (Pl. Ex. 10D; Pl. Ex. 10B).
- On February 1, 2007, $30,000.00 was transferred by Sunbelt to MTC, and on the same day, $15,000.00 of that was transferred to TFLP and $15,000.00 to VP. (Pl. Ex. 10D; Pl. Ex. 10B; and Pl. Ex. 11F).

### 5. *Liability for Sunbelt Transfers under Section 550*

The Court concludes the sum of parts 1 through 4 above is that TFLP is liable under 11 U.S.C. § 550 to the Trustee as the immediate or mediate transferee of the Sunbelt Transfers in the amount of $290,000.00; VP is liable to the Trustee as the immediate or mediate transferee of $450,000.00 of the Sunbelt Transfers; and MTC is liable for $670,000.00 as the mediate or immediate transferee of the Sunbelt Transfers.

### C. *MTC Other Transfers*

### 1. *July 25, 2006 Transfer of $300,000.00*

The Court concludes TFLP is the immediate transferee of $82,000.00 and VH is

---

flect the $80,000 withdrawal. The Court finds the funds came from Sunbelt. (*See* Expert Report, Ex. II, Schedule 1).

the immediate transferee of $7,000.00 of this Transfer, composed of the following transactions: The Court finds that, on the date of the Transfer from the Debtor to MTC of $300,000.00, MTC's bank account balance was only approximately $2,858.00. (Pl. Ex. 10B). On the same date the Transfer was received, Plaintiff's Exhibit 11C reflects $80,000.00 paid from MTC to TFLP and $5,000.00 paid from MTC to VH. Thereafter, on July 31, 2006, another $2,000.00 was paid from MTC to TFLP and $5,000.00 was paid from MTC to VH. (Pl. Ex. 11C and Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 3/42–6/42). Given that MTC began with a $2,858.00 balance, the Court has concluded $3,000.00 of the first $5,000.00 payment to VH was not from the Transfer. The remaining $5,000.00 paid to VH and $82,000.00 paid to TFLP were from the Transfer.

### 2. October 26, 2006 Transfer of $100,000.00

The Court concludes TFLP is the immediate transferee of $15,000.00 of this Transfer, and VP is the immediate transferee of $30,000.00 of this Transfer. On October 26, 2006, Debtor transferred $100,000.00 to MTC's bank account, which at that time had a balance of $20,529.86. (Pl. Ex. 10B). On October 26, 2006, MTC transferred $30,000.00 from its account and the Court concludes MTC first used its existing balance to make this transfer. By the close of business on October 26, 2006, MTC's bank balance was $72,910.32, all of which was proceeds of the MTC Other Transfer. No other deposits were made into the account until November 9, 2006. MTC transferred $15,000.00 directly to TFLP and $15,000.00 to VP on October 31, 2006. (Pl. Ex. 11C). The MTC 2006 Ledger reflects another $15,000.00 paid to Reese & Hopkins on November 2, 2006. (Pl. Ex. 11C). Plaintiff's expert found that, although the MTC 2006 Ledger reflected a transfer to Reese & Hopkins, the funds were actually deposited in the VP account. (Expert Report: Ex. IV, Schedule 2, Ex. F, pp. 17/50–19/50).

In sum, the Court concludes that, based on the transactions detailed above, TFLP is the mediate or immediate transferee of $97,000.00 of MTC Other Transfers, VP is the mediate or immediate transferee of $30,000.00 of MTC Other Transfers and VH is the mediate or immediate transferee of $7,000.00 of MTC Other Transfers.

### D. MTC Deposited Checks
#### 1. $473,019.65 on July 31, 2006

In July 2006, the Debtor wrote Check No. 1089 to MDG in the amount of $473,019.65, which was deposited into the MTC SunTrust account on July 31, 2006 when MTC's balance was $40,098.29. (Pl. Ex. 10B; UF Nos. 65 and 66). MTC received no other deposit of funds until August 21, 2006. On July 31, 2006, MTC made two electronic transfers totaling $7,000.00. On August 1, 2006, MTC paid $6,623.00 in checks and made a $6,000.000 electronic transfer, leaving $20,475.29 of the pre-Transfer balance.

MTC then transferred $30,000.00 to VP and $30,000.00 to TFLP, both on August 1, 2006. (UF Nos. 67 and 70). The Court assumes the first Transfer of $30,000.00 to VP consisted of $20,000.00 of MTC's pre-Transfer funds and $10,000.00 of the MTC Deposited Check Transfer. On the same date that MTC transferred $30,000.00 to TFLP, Ms. Trell signed Check No. 1058 payable to Mr. Trell from the TFLP account in the amount of $30,000.00. (UF No. 73). Also on August 1, 2006, MTC paid TFLP $177,250.00 (UF No. 70), and then Ms. Trell signed Check No. 1059 payable to Mr. Trell from the TFLP account in the same amount. (UF No. 74). On August 10, 2006, MTC paid Mr. Trell $135,000.00. (UF No. 72). MTC paid $15,000.00 to each of TFLP and VP on August 15, 2006. (UF Nos. 71 and 68).

On August 15, 2006, Ms. Trell signed Check No. 1060 payable to Mr. Trell from the TFLP account for the same $15,000.00. (UF No. 75). MTC's daily bank balance on August 18, 2006 was negative $10,707.13, so there is no doubt that MTC had spent 100% of the funds transferred by the Debtor by that date. (Pl. Ex. 10B). The transactions described support the Court's conclusion VP is the immediate transferee of $25,000.00, TFLP is the immediate transferee of $222,250.00, and Mr. Trell is the immediate or mediate transferee of $357,250.00.

### 2. *$297,085.00 on September 14, 2006*

On the date MTC deposited a check in the amount of $297,085.00 payable to MDG, MTC's bank balance was $12,386.56. (Pl. Ex. 10B). MTC received an additional $100,000.00 deposit that day. No other deposits were received in the MTC account until October 26, 2006. The Court assumes MTC spent the non-MTC Deposited Checks first. By September 19, 2006, MTC's bank balance was $289,252.02, so the Court concludes all transfers from September 19, 2006 to October 26, 2006 were of Debtor transferred funds. MTC transferred $15,000.00 to each of TFLP and VP on September 29, 2006. (Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 20/42–21/42 and Schedule 2, Ex. F, pp. 11/50–12/50; Pl. Ex. 11C; and UF No. 82). On October 6, 2006, MTC transferred $50,000.00 to Sunbelt, all of which was paid to VP in two transfers of $35,000.00 on October 6, 2006 and $15,000.00 on October 20, 2006. (Expert Report: Ex. IV Schedule 2, Ex. J, pp. 5/26–6/26; Pl. Ex. 10D; Pl. Ex. 10B; and Pl. Ex. 11C). On October 16, MTC transferred $15,000.00 to Mr. Trell and $15,000.00 to VP. (Pl. Ex. 11C; Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 12/42–13/42 and Schedule 2, Ex. F, pp. 13/50–14/50). In sum, Mr. Trell was the immediate or mediate transferee of $15,000.00, VP was the immediate or mediate transferee of $80,000.00, Sunbelt was

the immediate transferee of $50,000.00, and TFLP was the mediate or immediate transferee of $15,000.00.

### 3. *$169,295.00 Transfer on November 9, 2006*

The Court has previously found that MTC deposited a check from the Debtor in the amount of $169,295.00 made payable to MD Medical. The Court notes that, on the same date, MTC received another deposit of $30,000.00 and that the closing balance in MTC's account on November 8, 2006, before these deposits was $27,851.16. (Pl. Ex. 10B). For purposes of this analysis, the Court assumes that MTC spent the $57,851.16 it received from other sources first. Nevertheless, by November 15, 2006, MTC's bank balance was $125,141.57. MTC did not receive another deposit until November 22, 2006, when it received $35,000.00. Thus, all expenditures from MTC's bank account between November 15, 2006 and November 22, 2006 were of the funds transferred by the Debtor to MTC. MTC transferred $15,000.00 to each of TFLP and VP on November 16, 2006. (Pl. Ex. 11C; Expert Report Ex. IV, Schedule 1, Ex. A, pp. 26/42–27/42). The Court notes that, although $35,000.00 was deposited into the MTC account on November 22, 2006, the exact same amount was withdrawn on the same day, so the Court presumes the funds in MTC's account at the end of the month, $43,408.10, were the remaining balance from the Transfer of the Debtor's funds. (Pl. Ex. 10B). On December 1, 2006, MTC transferred $15,000.00 to each of TFLP and VP. (Pl. Ex. 11C; Expert Report: Ex. IV, Schedule 1, Ex. A, pp. 29/42–30/42 and Schedule 2, Ex. F. pp. 25/50–26/50).

The Court concludes TFLP is the immediate transferee of $30,000.00 and VP is the immediate transferee of $30,000.00 of this Transfer.

Based on sections 1 through 3 above, the Court concludes the following are liable to the Trustee under 11 U.S.C. § 550 as the mediate or immediate transferee of the MTC Deposited Checks:

| | |
|---|---|
| The Trell Family Limited Partnership | $267,250.00 |
| Vinson Partners, L.L.L.P. | $135,000.00 |
| Franklin P. Trell | $372,250.00 |
| Sunbelt | $ 50,000.00 |

## III. ALTER EGO

In addition to recovery under 11 U.S.C. §§ 544 and 550, the Trustee has asked the Court to determine that Mr. Trell and Ms. Vinson were the alter egos of the Debtor and therefore liable for all claims in the bankruptcy case against the Debtor, including all administrative expenses.

 To justify disregarding a corporate entity as an alter ego, the plaintiff must show the principals "disregarded the corporate entity and made it a mere instrumentality for the transactions of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exists." *Baillie Lumber Co. v. Thompson,* 279 Ga. 288, 290, 612 S.E.2d 296 (2005) (citations omitted). To determine whether the corporate entity has been disregarded, the courts typically look at whether the principals commingled the assets of the company with their personal assets or otherwise confused the assets, records and liabilities of the individual and the corporation. Piercing the corporate veil, or finding that a company is the alter ego of an individual, is justified where the owner treats the company and himself as one unit, *Id.,* or where the owner uses the corporate funds for personal expenses. *See Scott Bros., Inc. v. Warren,* 261 Ga.App. 285, 582 S.E.2d 224 (2003) (citations omitted).

### A. Mr. Trell and Ms. Vinson as Alter Ego of Debtor

 After review of all the evidence, the Court declines to conclude that Mr. Trell and Ms. Vinson were the alter egos of the Debtor. First, Mr. Trell and Ms. Vinson were not the only owners of the Debtor. Dr. Stuart owned 34 percent of the Debtor. While there is no doubt that money was moved from the Debtor to other companies in which Mr. Trell and Ms. Vinson were the sole owners, the evidence did not show that Mr. Trell and Ms. Vinson disregarded the corporate entity of the Debtor in doing so, or used the funds of the Debtor directly to pay personal expenses. The analysis above under 11 U.S.C. § 550 shows further that, while a substantial amount of transfers from the Debtor ultimately made their way to Mr. Trell's and Ms. Vinson's personal partnerships, it was by no means all of the funds transferred by the Debtor to MTC or Sunbelt. The transfers to Sunbelt and MTC avoided in this Order were certainly not all, or even a majority, of the funds received by the Debtor from CIT or other sources. Therefore, the Court denies the Trustee's requests to determine Mr. Trell and Ms. Vinson are alter egos of the Debtor and liable for all claims against the estate.

### B. Trells and Vinsons as Alter Egos of Their Family Partnerships

The Court next considers whether to hold that Mr. and Ms. Trell are the alter egos of TFLP and Mr. and Ms. Vinson are the alter egos of VH and VP. The law with respect to alter ego is the same as discussed above, but the facts are unique in each situation.

### 1. *Vinsons*

Cynthia Vinson testified that VH and VP were wholly owned by her husband, Dana, and her. Neither of the Vinson family partnerships ever filed a tax return. (UF Nos. 58, 59). The Undisputed Facts show funds were moved from VP to VH regularly. (UF Nos. 69, 83, 94, 105, 110, 116, 120). Ms. Vinson testified to using funds of both the family partnerships to pay the personal expenses for her husband and herself. Ms. Vinson testified her husband had not worked in a number of years. She also testified the funds in VH and VP accounts were used to buy a vacation home in Sevierville, Tennessee, which was placed in her husband's name, and then to furnish and remodel the home. The Undisputed Facts also show that funds from VH and VP were used to distribute cash in the amount of $163,897.62 to Mr. Vinson, to purchase a motorcycle, to make payments to a Ford dealership, and to purchase a home in Newnan, Georgia. (UF Nos. 93, 103–111, 126 and 127). Based on the evidence, the Court concludes Mr. and Ms. Vinson disregarded their family partnerships' corporate entities, used VH and VP interchangeably, and in fact used the family partnerships as mere instrumentalities for the transaction of their own personal affairs. Therefore, the Court holds: (a) Mr. and Ms. Vinson liable for all amounts for which VP or VH is liable to the Trustee, being a total of $622,000.00; and (b) VH and VP liable for all amounts which the other owes to the Trustee, so each is liable for the total of $622,000.00.

### 2. *Trells*

The Trustee has not carried her burden of proof as to Mr. and Ms. Trell being the alter egos of TFLP. The Trustee argues without dispute that Mr. and Ms. Trell are partners in TFLP and are signatories on TFLP's accounts. TFLP never filed any tax returns. The Undisputed Facts reflect that, on several occasions, funds which were transferred from the Debtor to MTC to TFLP were immediately transferred via personal check to Mr. Trell. On occasion, the MTC 2006 Ledger reflects a payment to Mr. Trell individually while transferring the funds to TFLP, thus showing some commingling between Mr. Trell and TFLP. Each of the personal checks was signed by Ms. Trell. Mr. Trell testified that his spouse did not work outside the home, so the funds in the TFLP account came from his efforts. Unlike Ms. Vinson's testimony regarding VP and VH, there was no evidence as to the function and use of the TFLP funds. There was no evidence of the use of the funds generally in TFLP. There was no evidence as to other ownership interests in TFLP. The Court therefore concludes the Trustee did not prove the Trells disregarded the corporate entity of TFLP and made it a mere instrumentality for the transaction of their own affairs.

### CONCLUSION

In accordance with the Findings of Fact and Conclusions of Law set out above, the Court enters judgment in the following amounts:

| | |
|---|---|
| MTC Development, LLC | $2,009,399.65 |
| Sunbelt Construction Management, Inc. | $1,565,000.00 |
| Franklin P. Trell | $ 372,250.00 |
| Cynthia Vinson | $ 622,000.00 |
| Vinson Holding, Inc. | $ 622,000.00 |
| Vinson Partners, L.L.L.P. | $ 622,000.00 |
| The Trell Family Limited Partnership | $ 654,250.00 |
| Project Personnel Leasing, LLC | $–0– |
| Dana Vinson | $ 622,000.00 |
| Shaaron Trell | $–0– |

The Trustee is only entitled to a single satisfaction on any given Transfer from the initial transferee, immediate transferee or mediate transferee.

IT IS ORDERED.

## EXHIBIT A

*July 25, 2006*

| | | |
|---|---|---|
| Assets | | |
| Cash | $1,000,128.60 | |
| Leasehold Improvements | 308,399.98 | |
| TOTAL ASSETS | | $1,308,528.58 |
| | | |
| Liabilities | | |
| Batson–Cook | ($61,000.00) | |
| Dr. Stuart | (864,562.00) | |
| Partitions, Suite 340 | (288,485.00) | |
| Contingent Liability to Investors at 50% | (925,000.00) | |
| SUBTOTAL | ($2,139,047.00) | |
| | | |
| Related Company Liabilities | | |
| MTC | ($168,550.00) | |
| Trell | (32,500.00) | |
| SUBTOTAL | ($201,050.00) | |
| | | |
| TOTAL LIABILITIES | | ($2,340,097.00) |

*July 31, 2006*

| | | |
|---|---|---|
| Assets | | |
| Cash | $288,242.45 | |
| Leasehold Improvements | 308,399.98 [5] | |
| TOTAL ASSETS | | $596,642.43 |
| | | |
| Liabilities | | |
| Batson–Cook | ($61,000.00) | |
| Dr. Stuart | (864,562.00) | |
| Partitions, Suite 340 | (288,485.00) | |
| Contingent Liability to Investors at 50% | (925,000.00) | |
| SUBTOTAL | ($2,139,047.00) | |
| | | |
| Related Company Liabilities | | |
| MTC | ($168,550.00) | |

5. The transfer on July 31, 2006 of $473,019.65 was a check made out to MDG and deposited in the MTC account. Debtor's Ledger books this transfer as an increase in value in leasehold improvements. Given the Court's finding later in this opinion that the transfer was a fraudulent conveyance, the Court has not increased the value of the leasehold improvements allegedly resulting from that check.

| | | |
|---|---|---|
| Trell | (32,500.00) | |
| SUBTOTAL | ($201,050.00) | |
| TOTAL LIABILITIES | | ($2,340,097.00) |

*August 30, 2006*

| | | |
|---|---|---|
| Assets | | |
| Cash | $1,091,124.35 | |
| Leasehold Improvements | 469,598.48 [6] | |
| TOTAL ASSETS | | $1,560,722.83 |
| | | |
| Liabilities | | |
| Batson–Cook | ($61,000.00) | |
| *Dr. Stuart, Initial Liability* | (864,562.00) | |
| *Dr. Stuart, Contingent Liability* | (338,741.83) | |
| Dr. Stuart Total | (1,203,303.83) | |
| *Partitions, Suite 340* | (288,485.00) | |
| *Partitions, Suite 340* | (42,843.00) | |
| *Partitions, Suite 300* | (32,935.00) | |
| Partitions Total | (364,263.00) | |
| Contingent Liability to Investors at 50% | (925,000.00) | |
| SUBTOTAL | ($2,553,566.83) | |
| | | |
| Related Company Liabilities | | |
| MTC | ($168,550.00) | |
| Trell | (32,500.00) | |
| SUBTOTAL | ($201,050.00) | |
| TOTAL LIABILITIES | | ($2,754,616.83) |

*September 14, 2006*

| | | |
|---|---|---|
| Assets | | |
| Cash | $655,216.89 | |
| Leasehold Improvements | 499,915.00 [7] | |
| TOTAL ASSETS | | $1,155,131.89 |
| | | |
| Liabilities | | |
| Batson–Cook | ($61,000.00) | |
| *Dr. Stuart, Initial Liability* | (864,562.00) | |
| *Dr. Stuart, Contingent Liability* | (338,741.83) | |
| Dr. Stuart Total | (1,203,303.83) | |
| *Partitions, Suite 340* | (288,485.00) | |
| *Partitions, Suite 340* | (42,843.00) | |

6. See Footnote 5. 7. See Footnote 5.

| | | |
|---|---|---|
| *Partitions, Suite 300* | *(32,935.00)* | |
| Partitions Total | (364,263.00) | |
| Contingent Liability to Investors at 50% | (925,000.00) | |
| SUBTOTAL | ($2,553,566.83) | |
| | | |
| Related Company Liabilities | | |
| MTC | ($168,550.00) | |
| Trell | (32,500.00) | |
| SUBTOTAL | ($201,050.00) | |
| | | |
| TOTAL LIABILITIES | | ($2,754,616.83) |

*October 26, 2006*

| | | |
|---|---|---|
| Assets | | |
| Cash | $524,644.30 | |
| Leasehold Improvements | 499,915.00 [8] | |
| TOTAL ASSETS | | $1,024,559.30 |
| | | |
| Liabilities | | |
| Batson–Cook | ($61,000.00) | |
| *Dr. Stuart, Initial Liability* | *(864,562.00)* | |
| *Dr. Stuart, Contingent Liability* | *(338,741.83)* | |
| Dr. Stuart Total | (1,203,303.83) | |
| *Partitions, Suite 340* | *(288,485.00)* | |
| *Partitions, Suite 340* | *(42,843.00)* | |
| *Partitions, Suite 300* | *(32,935.00)* | |
| Partitions Total | (364,263.00) | |
| Toshiba | (450,369.59) | |
| Contingent Liability to Investors at 50% | (925,000.00) | |
| SUBTOTAL | ($3,003,936.42) | |
| | | |
| Related Company Liabilities | | |
| MTC | ($168,550.00) | |
| Trell | (32,500.00) | |
| SUBTOTAL | ($201,050.00) | |
| | | |
| TOTAL LIABILITIES | | ($3,204,986.42) |

*November 8, 2006*

| | | |
|---|---|---|
| Assets | | |
| Cash | $244,252.26 | |
| Leasehold Improvements | 499,915.00 [9] | |
| TOTAL ASSETS | | $744,167.26 |

**8.** See Footnote 5. **9.** See Footnote 5.

Liabilities
| | | |
|---|---|---|
| Batson–Cook | | ($61,000.00) |
| *Dr. Stuart, Initial Liability* | *(864,562.00)* | |
| *Dr. Stuart, Contingent Liability* | *(338,741.83)* | |
| Dr. Stuart Total | | (1,203,303.83) |
| *Partitions, Suite 340* | *(288,485.00)* | |
| *Partitions, Suite 340* | *(42,843.00)* | |
| *Partitions, Suite 300* | *(32,935.00)* | |
| Partitions Total | | (364,263.00) |
| Toshiba | | (450,369.59) |
| Contingent Liability to Investors at 50% | | (925,000.00) |
| SUBTOTAL | | ($3,003,936.42) |

Related Company Liabilities
| | |
|---|---|
| MTC | ($168,550.00) |
| Trell | (32,500.00) |
| SUBTOTAL | ($201,050.00) |

| | |
|---|---|
| TOTAL LIABILITIES | ($3,204,986.42) |

*November 9, 2006*

Assets
| | |
|---|---|
| Cash | $74,928.94 |
| Leasehold Improvements | 499,915.00 [10] |
| TOTAL ASSETS | $574,843.94 |

Liabilities
| | | |
|---|---|---|
| Batson–Cook | | ($61,000.00) |
| *Dr. Stuart, Initial Liability* | *(864,562.00)* | |
| *Dr. Stuart, Contingent Liability* | *(338,741.83)* | |
| Dr. Stuart Total | | (1,203,303.83) |
| *Partitions, Suite 340* | *(288,485.00)* | |
| *Partitions, Suite 340* | *(42,843.00)* | |
| *Partitions, Suite 300* | *(32,935.00)* | |
| Partitions Total | | (364,263.00) |
| Toshiba | | (450,369.59) |
| Contingent Liability to Investors at 50% | | (925,000.00) |
| SUBTOTAL | | ($3,003,936.42) |

Related Company Liabilities
| | |
|---|---|
| MTC | ($168,550.00) |
| Trell | (32,500.00) |
| SUBTOTAL | ($201,050.00) |

| | |
|---|---|
| TOTAL LIABILITIES | ($3,204,986.42) |

10. See Footnote 5.

*November 21, 2006*

Assets
| | | |
|---|---|---|
| Cash | | $4,578.55 |
| Leasehold Improvements | | 499,915.00 [11] |
| TOTAL ASSETS | | $504,493.55 |

Liabilities
| | | |
|---|---|---|
| Batson–Cook | | ($61,000.00) |
| *Dr. Stuart, Initial Liability* | *(864,562.00)* | |
| *Dr. Stuart, Contingent Liability* | *(338, 741.83)* | |
| Dr. Stuart Total | | (1,203,303.83) |
| *Partitions, Suite 340* | *(142,550.00)* | |
| *Partitions, Suite 340* | *(42,843.00)* | |
| *Partitions, Suite 340* | *(72,250.43)* | |
| *Partitions, Suite 340* | *(31,845.60)* | |
| *Partitions, Suite 300* | *(32,935.00)* | |
| *Partitions, Suite 397* | (23,880.00) | |
| *Partitions, Suite 397* | *(96,402.87)* | |
| Partitions Total | | (442,706.90) |
| Toshiba | | (450,369.59) |
| Contingent Liability to Investors at 50% | | (925,000.00) |
| SUBTOTAL | | ($3,082,380.32) |

| | |
|---|---|
| TOTAL LIABILITIES | ($3,082,380.32) |

11. See Footnote 4.